IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Criminal Action No. 24-cr-00082-RMR

UNITED STATES OF AMERICA,

      Plaintiff,

      vs.

NATHAN JAMES MEEK,

      Defendant.

-----------------------------------------------------------------

REPORTER'S TRANSCRIPT

Jury Trial, Vol. IV

-----------------------------------------------------------------

Proceedings before the HONORABLE REGINA M. RODRIGUEZ, District Judge, United States District Court for the District of Colorado, commencing on the 17th day of July, 2025, in Courtroom A901, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiff:
DANIEL MCINTYRE and EDWIN GARRETH WINSTEAD, III, United States Attorney's Office, 1801 California Street, Suite 1600, Denver, CO 80202


For the Defendant:
RONALD GAINOR, Gainor & Donner, 10722 Ashford Circle, Highlands Ranch, Colorado 80126

RICHARD BANTA, 501 South Cherry Street, Suite 1100, Denver, Colorado 80246 Office of the Federal Public Defender, 633 17th Street, Suite 1000, Denver, CO  80202


Reported by SADIE L. HERBERT, RPR, RCR, 901 19th Street, Denver, CO 80294, (303)335-2105


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

PROCEEDINGS

(Proceedings commenced at 8:07 a.m.)

THE COURT:  Good morning, everybody.  We're back on the record in 24-CR-00082, United States v. Meek.  We're gathered here today this morning for the charging conference in this matter.  I will tell you we've gotten a steady stream of additional jury instructions from the defendants.  Let's march through those in a moment.

I did want -- there's a couple of things I also want to make sure we get done today.

Mr. Gainor, you requested the Court give an advisement to your client.  Do you still request that?

MR. GAINOR:  Yes, your Honor.  And the Court has just reminded me by asking that, I guess I have to reaffirm the same, just relying on what I said at the beginning of the Rule 29, that we're reasserting the same argument now that we're resting, right.  So I just wanted to put that on the record.  And I can just do that now, and I just did it now.

THE COURT:  Why don't we do this in order just so I don't leave anything out.

So once we complete the charging conference, I will give you an opportunity to -- I want to advise your client first, then you make the final decision after he's been advised as to what's going to happen.  Then you'll tell the Court what's officially going to happen, and then you can make your

583

24-cr-00082-RMR     Jury Trial, Vol.IV     July 17, 2025

final motion.  We'll address it then, all right?

MR. GAINOR:  That's much better.

THE COURT:  All right.  So let's go through these jury instructions.  We got one this morning.

MR. GAINOR:  And your Honor, just for placement, that corresponds to the government proposed investigation instruction on page 40 of 46 of Document 178.  This is for reference.

THE COURT:  I have these in a chart -- we put this in a chart format and I have my notes there.  So for ease of reference, will you just raise this when we get to that section?

MR. GAINOR:  Yes, your Honor.  It's in order.

THE COURT:  My clerk tells me that's my -- Instruction Number 31 is the investigation.

Has the government seen the proposed instruction by defendant, the modification they're asking?

MR. WINSTEAD:  Yes, your Honor, we have seen it.  We have taken a look at it.  We're prepared to address it.

THE COURT:  We'll address it in order.

MR. WINSTEAD:  And I think for most of the defense proposed ones, they have some corresponding.  So I don't know if --

THE COURT:  I think we have been able to slot those in on the ones we had advanced notice of, but the one we got just

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

today we haven't been able to address it.

So let's start with the statement of the case.

Now, I know you did not number it, the instructions, but we have internally numbered them so that we can start to keep track of them.  I'll refer to them now by either pattern jury instruction number or what it is so you can follow along.

Hold on just a second.

So with regard to the statement of the case, the statement of the case that we'll use for the instructions is just the same statement of the case that I read from the stipulated statement of the case at the beginning of the case.  So when the jury was seated as part of voir dire or once they were impaneled, I read the statement of the case.  That is the statement of the case we have inserted in the jury instructions.

All right?

MR. WINSTEAD:  Yes, your Honor.

THE COURT:  There was no objection to the introduction of final instructions, duty to follow instructions, presumption of innocence, burden of proof, reasonable doubt.  That's Tenth Circuit Pattern Jury Instructions 103 -- sorry, 1.03, 1.04.  The presumption of innocence, evidence defined, Pattern Instruction 1.06 -- actually, presumption of innocence, burden of proof should be 1.05, I think.

Evidence, direct and circumstantial, inferences,

585

24-cr-00082-RMR   Jury Trial, Vol.IV   July 17, 2025

Pattern Jury Instruction 1.07.

With regard to the credibility of witnesses, Pattern Jury Instruction 1.08.  This has been modified to reflect that the defendant is not testifying.

On Instruction Number, I think we would be using 1.08, the version where the defendant does not testify.

MR. GAINOR:  That's fine, your Honor.  No objection to that.

THE COURT:  All right.  Then no objection regarding impeachment by prior inconsistency, Pattern Jury Instruction 1.10; accomplice informant immunity, 1.14; accomplice co-defendant plea agreement, 1.15.

Defendant has tendered an instruction regarding the witness use of addictive drugs --

MR. GAINOR:  Your Honor, I'm sorry to interrupt.  We had inserted an instruction, co-defendant plea agreement, because that goes a little bit further than 1.15.

For ease, is it okay if I sit?

THE COURT:  Yes, just pull the microphone down in front of you.

MR. GAINOR:  And that would be Instruction 1 of Document 205.

THE COURT:  So the defense has offered what is captioned "Cautionary Instruction, Co-Defendant Plea Agreement."

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

Does the government have that?

MR. WINSTEAD:  Yes, your Honor.  I somehow have misplaced it, but I'm pulling it up on my computer.

THE COURT:  Let me see if I can get the actual instruction number.

The instruction that the defendant has tendered reads as follows:

"You are here" -- hold on a second.

"You are here to decide whether the government has proved beyond a reasonable doubt that Mr. Meek is guilty of the offenses charged, that the co-defendant, Ms. Foster, pleaded guilty and the terms of her plea agreement are relevant only to Ms. Foster's credibility as a witness and not for any other purpose.  Ms. Foster's guilty plea and the terms of her agreement are not evidence of Mr. Meek's guilt and you should not consider such evidence in considering whether the government has proved beyond a reasonable doubt that Mr. Meek is guilty beyond a reasonable doubt of the crimes charged other than when assaying Ms. Foster's credibility as a witness."

Mr. Winstead, what are the government's position?

MR. WINSTEAD:  Your Honor, we object to it.  It is not a standard instruction, and the precise content of it is clearly covered in the proposed Pattern Instruction 1.15.  All it does is sort of make additional confusion about some of those specifics.  The purpose of cross-examining the defendant

24-cr-00082-RMR     Jury Trial, Vol.IV     July 17, 2025

about those prior statements was certainly just to undermine her credibility.

But the terms of the plea agreement, the plea agreement itself is in evidence.  And, again, the facts that she told is obviously not evidence of the defendant's guilt, which is succinctly covered in the pattern instruction.

THE COURT:  All right.

MR. GAINOR:  And your Honor, a brief response.  I will note, for the record, that the first words out of the prosecutor's mouth was that this is not a pattern instruction, and that will be remembered when we're dealing with their other instructions, these are not pattern instructions.

Having said that -- and I know that I objected to that plea agreement, and that objection we believe is preserved -- I do realize that by giving that instruction, I may be somewhat affecting that objection because it is a cautionary instruction that I can refer to in closing.  I do not think that cures the issue, but I think that that could be something that the Court considers.

The current 1.15 does not address the concerns in this co-defendant plea agreement cautionary.  It addresses the appropriate concern of having it come in.  It somewhat addresses my objection, but we think that there is no downside to it, it is accurate, and we think it is appropriate to give. And it could just be added to 1.15 at the end.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

588

24-cr-00082-RMR   Jury Trial, Vol.IV   July 17, 2025

THE COURT:  Well, that's what I'm looking at here, as to whether there's some language that we could add to 1.15.

It does appear that Section 1.15 does really address what the defense is attempting to address here.  It does appear that the defense is trying to expound on that and drive home the point.  But 1.15 in the pattern jury instruction does seem to sufficiently address that.

The only thing that I could see that has not been sufficiently addressed is the issue with regard to Ms. Foster, specifically identifying it as Ms. Foster as the co-defendant.  Perhaps we could add the language that says, "Co-Defendant Ms. Foster -- that co-defendant Ms. Foster plead guilty and the terms of her plea agreement are relevant only as to Ms. Foster's credibility as a witness and not for any other purpose.""

Does the government have a position on that?

MR. WINSTEAD:  I think that that's fine.

Is the Court proposing to sort of modify that last sentence?

THE COURT:  Yes.

MR. WINSTEAD:  So I think the -- it's sort of two separate concepts.

THE COURT:  Sorry.  I don't know that it would be the last sentence.  I think we would -- what I had envisioned is including that in the second paragraph, perhaps after the

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

second sentence.

MR. WINSTEAD:  I think that's fine.  I just wanted to make sure it was sort of distinct because this is sort of making clear the fact that she pled guilty is not evidence at all.  The terms of the plea agreement and everything else is relevant only to her credibility.  Those are sort of -- as long as those are kind of kept distinct.  I wouldn't want it to sort of denigrate the purport of that last sentence.  But as long as it's kept in two separate ways, I think that's fine.

MR. GAINOR:  Respectfully, your Honor, we think it's insufficient.  The operative sentence is the last one, which is Ms. Foster's guilty plea and the terms of her agreement are not evidence of Mr. Meek's guilt.  I think it's crucial that the jury be told that, and that's why -- that's the most significant part of the requested instruction.

THE COURT:  Well, that does invite confusion in as much as it appears to be saying that Ms. Foster's -- the evidence given by Ms. Foster is not evidence of Mr. Meek's guilt.  So I am concerned that the way it is phrased in your last sentence there is confusing, which is why I am trying to identify an alternative.  And it seems to me that that sentence that Ms. Foster -- the fact that she has pled guilty and the terms of her plea agreement are only relevant to her credibility.

MR. GAINOR:  Well, the converse is true.  And I

590

24-cr-00082-RMR     Jury Trial, Vol.IV     July 17, 2025

recognize the Court's point intellectually, but by not clarifying that, there's a danger the jury will say, well, since she pled guilty to a conspiracy, Meek is guilty too. That's the danger of that.

THE COURT:  Well, the sentence in the pattern jury instructions specifically addresses that, which says, "The fact that an accomplice has entered a guilty plea to the offense charged is not evidence of the guilty of any other person."

MR. GAINOR:  Is that in the pattern?

THE COURT:  Yes, it's the last sentence in the pattern.

MR. WINSTEAD:  Your Honor, I may not have expressed this as clearly before, but the reason why we think it would be confusing to include anything about the plea agreement itself in that prohibition of using it as evidence is that, as the Court witnessed, getting extensive facts from the witness was really difficult.  But one thing she did do was look at the facts in that plea agreement and adopt them as her testimony at trial.  And so I think that it makes it really confusing to sort of distinguish, well, what's in her plea agreement and what can she adopt on the stand and include as her testimony. She specifically said, yes, those facts are true.  So it's part of her testimony and it is fair testimony.

MR. GAINOR:  The problem with this case is there's a multitude of statements and acts that are inconsistent with one

another.

The sentence that the Court points to at the bottom of 1.15 says "The fact that an accomplice enters a guilty plea," that should be changed to co-defendant, because that is going to cause confusion. Rhonda Cruz could be an accomplice.

THE COURT: Fair enough. That makes sense.

MR. WINSTEAD: Or I'm okay with putting in Ms. Foster.

THE COURT: I agree with that. That was my first suggestion.

MR. GAINOR: That's a great group settlement.

THE COURT: We have three minds aligned here, all right.

I think that this instruction, if we add the one sentence that I referred to about Co-Defendant Foster pleaded guilty and the terms of her plea agreement are relevant only to Ms. Foster's credibility as a witness and not for any other purpose is a correct statement, we should add it to this second paragraph.

Mr. Winstead, what you are drawing is a fine line distinction between the terms of her plea agreement and the factual underpinnings of her agreement. The Court is not going to draw attention to any particular piece of evidence in its instruction. And given you will have these instructions for your closings, it would seem to me that if you want to draw that fine line distinction for the jury, you are free to do

that and point out her plea agreement in that way.  But I don't believe we should craft a jury instruction to address a particular piece of evidence.  That's for the jury to do.

MR. WINSTEAD:  I agree, your Honor.  And I agree with that proposed language the Court said.

THE COURT:  All right.

MR. WINSTEAD:  The only last thing I wanted to note is there was a typo I put in the header in case that made it through.

MR. GAINOR:  Co-defendant.

MR. WINSTEAD:  Yes.

MR. GAINOR:  Could we just confirm what the language is?  I think the settlement the Court has come up with really does address the issue.  I just want to make sure I --

THE COURT:  Well, as I read paragraph 2 of Pattern instruction 1.15, this is the way that I am proposing it would read.  "An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying.  On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict.  You should receive this type of testimony with caution and weigh it with great care.  The co-defendant, Ms. Foster, testified in this case and pleaded guilty" -- sorry.  Let's just take it exactly the way you have it in your proposal, Mr. Gainor, rather than trying to change something.

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

So then it would say after the words "weigh it with great care," "You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt.  That co-defendant, Ms. Foster, pleaded guilty and the terms of her plea agreement are relevant only to Ms. Foster's credibility as a witness and not for any other purpose.  The fact that Ms. Foster has entered a guilty plea to the offense charged is not evidence of the guilt of any other person."

MR. GAINOR:  That's fine with the defense.

MR. WINSTEAD:  I think that's fine, your Honor.

MR. GAINOR:  I don't like having my objections neutralized, but I appreciate everything that the Court is doing in terms of trying to make this work.

THE COURT:  The next instruction is -- or said a different way, the defendant has tendered Instruction 1.16 -- wait a minute.

So Instruction 1.16 is the witness use of addictive drugs.  This is Pattern Instruction 1.16.  This was not included in the original stipulated to set of instructions, but the defendant has now tendered this.

What is the government's position on including this?  It is indeed a pattern instruction.

MR. WINSTEAD:  It is.  The only modification is Renee Foster and Rhonda Cruz are admitted abusers of drugs, the

pattern instruction language is a little bit more neutral.

Just "may be considered abusers of drugs."  I think the more neutral is more reasonable.

THE COURT:  I will use the language of the pattern instruction.  So the instruction would read, "Renee Foster and Rhonda Cruz may be considered abusers of drugs."

With that change to the defendant's proposed Pattern Instruction 1.16, the Court will give this instruction.

Then we next have the expert witness instruction, which is Pattern Instruction 1.17.  That is stipulated.

The on or about instruction, Pattern Instruction 1.18 --

MR. WINSTEAD:  I'm sorry to interrupt, your Honor. Just wanted to make sure, on the expert witnesses, we had originally included a whole range of experts, but we need to take out all that stuff.

THE COURT:  I think "Understanding the evidence as it came in," we took that out.

MR. WINSTEAD:  And I also had a typo in the first sentence.

THE COURT:  Get your typos to Ms. Keast-Nachtrab and we'll make sure those get included.

MR. WINSTEAD:  Great.

THE COURT:  So there was no objection to Pattern Instruction 1.18 as modified.

24-cr-00082-RMR      Jury Trial, Vol.IV    July 17, 2025

Next instruction is the Tenth Circuit Pattern Instruction 1.19 regarding consideration only of the crime charged.  Defendant has objected and has tendered its proposed pattern instruction.

MR. GAINOR:  Your Honor, I'm going to withdraw that.

THE COURT:  Okay.

MR. GAINOR:  Because I'm looking at this again, and the pattern instruction, even though it's updated 2021, I think it's sufficient.

THE COURT:  So that being withdrawn, the Tenth Circuit Pattern Instruction 1.19 is not objected to and will be given.

The only thing I would say there is I think, yes, there was a typo in that one, and it should include -- where it says "Indictment," it should say "Superseding indictment"; correct?

MR. GAINOR:  We're on 1.19?

MR. WINSTEAD:  Yes.

THE COURT:  Yes.  At the end of the first paragraph, in the government's version, it refers to the indictment.  It should say superseding indictment.  I think we need to double-check that throughout these instructions.  I understand how that happens, but really what we read to the jury said superseding indictment, so we should change that throughout.

MR. GAINOR:  We agree.

THE COURT:  No objection to Pattern Instruction 1.20,

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Pattern Instruction 1.21.

Then we have the indictment, which would be read.  It will be the superseding indictment.

Then next in the order would be the Pattern Jury Instruction 2.85, which is Count 1.  Then 2.85, Count 2, 2.85, Count 3, 2.85, Count 4.

Next in the lineup would be the instruction regarding possession with intent to distribute 2.85, and then possession of a firearm by a convicted felon, 2.44.

Let me double-check that one.  I guess a question I have is that given Defendants have conceded this count, do you want to deal differently with the jury instructions on that just so we don't have any inconsistencies?

MR. GAINOR:  I think since the record --

THE COURT:  You can stay seated, Mr. Gainor.

MR. GAINOR:  I think since we want to have consistency with the jury instructions, the best way to do it from the Tenth Circuit perspective is keep it in there.  We'll make it clear in the argument.

THE COURT:  All right.  Then the next instruction is possession of a firearm in furtherance of a drug trafficking crime.  The defendant has raised an objection to the paragraph that reads, "In order to meet its burden to prove the first element above, the government only needs to prove beyond a reasonable doubt that the defendant committed possession with

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

the intent to distribute a controlled substance as alleged in one count of Count 1, Count 2, Count 3 or Count 4, not all."

The defendant, as I have said, has objected to that paragraph in the instruction.

I will note that that does not appear in the pattern jury instructions, but appears to be a clarification, given there are multiple counts here.

Mr. Gainor, do you want to state your objection for the record?

MR. GAINOR:  Yes, your Honor.  This is just one of the examples of, again, I know the government doesn't think this way necessarily, but what's good for the goose is good for the gander.  They object to an instruction that's not in a pattern, but then it's good for them.  I think they're stuck with the way they went to the grand jury on the superseding indictment. They charged a certain way.

I believe the instruction sufficiently, without the additional language, is something that the jury is able to understand and follow.  And the modification of this instruction -- and frankly, in 924(c) with multiple counts and multiple weapons, I have never seen this language added.  So it is a modification of the Tenth Circuit.  We object to it specifically and think it should be kept out.

THE COURT:  Mr. Winstead.

MR. WINSTEAD:  Your Honor, it doesn't seem as though

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

the defense is saying that it's an inaccurate statement of the law.  It's accurately applying in this situation the and/or difference from the indictment, which otherwise could potentially -- I mean, those two -- the indictment and the and/or together are obviously read to be able to understand this.  But because that takes sort of an intuitive link, I think all we are doing here is avoiding a future juror question with an accurate statement of how the count works.

MR. GAINOR:  But the problem is the government takes literary license when they draft this.  It's very nuanced and they fly under the radar often.  It's a great technique.  But the problem is they add the language only, and that focuses it, modifies it and then changes the meeting.  So as stated, it is an incorrect statement of the law.  There is no support for it, and frankly, I have never seen a 924(c) instruction that is standard and very clearly thought out by the Tenth Circuit.  Kudos to the government for being creative, but I just don't think it should affect the defendant's substantial rights, and it does.

THE DEFENDANT:  When you say the language "only," are you referring to the government that the government has included or are you referring to the superseding indictment?

MR. GAINOR:  No, referring to the language that the government has included, your Honor.

It really does affect and create the inference of a

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

lesser burden.  And when we're dealing with burden of proof,

proof beyond a reasonable doubt, essential tenets in a criminal

trial, we have to tread extremely carefully.

THE COURT:  Well, then, if your objection is to the

government's -- I believe it was your phrasing, Mr. Gainor --

creative use of the word "only" here, why don't we just strike

the word "only" from that paragraph?

But it does seem to me that the Court anticipates

there could be confusion there.

MR. GAINOR:  Well --

THE COURT:  This instruction then just says that the

government must prove beyond a reasonable doubt the intent to

distribute a controlled substance as alleged in one of Count 1,

2, 3 or 4, not all.

MR. GAINOR:  Yes, your Honor.

THE COURT:  Next one, conspiracy, Pattern Jury

Instruction 2.87.  Defendant would like to add language, which

does not appear in the pattern instruction, except the fifth

element -- excuse me.  The highlighted language, yes, that

defendant is asking to add is not in the pattern instructions.

MR. GAINOR:  And based on the unique facts of the

case.  This is the one, just so we're clear for the record,

labeled Theory of Defense Instruction.  There are two of them.

And that's Document 203, Page 3 of 7.

THE COURT:  All right.  Ms. Keast-Nachtrab, what page

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

number is that on from my -- I have it in the chart, but where is the actual language?

LAW CLERK:  Your Honor, I'm trying to find it also.

THE COURT:  All right.

MR. GAINOR:  And your Honor, when the Court is considering this, the timing of it is perfect in terms of what we just spoke about, which is the 924(c).  I would ask the Court also to review the first element of that instruction because it talks about committed the crime of possession with intent to distribute a controlled substance as charged in Counts 1 through 4.  So that reference language for the 924(c), which I believe is Count 6 of the indictment, to be consistent, the theory of defense instruction requests the language that's in that instruction.

THE COURT:  Government, what is your position on this?

MR. WINSTEAD:  And so just to clarify, we're talking about Defense Proposed Instruction 2.87, controlled substances, conspiracy with all of the italicized additions?

MR. GAINOR:  Yes.

MR. WINSTEAD:  That's what we're currently talking about?

THE COURT:  Yes.

MR. GAINOR:  You have them labeled, it says "Theory of Defense Instruction."  I think it's important for the record that the "Theory of Defense" aspect be highlighted because

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

601
24-cr-00082-RMR   Jury Trial, Vol.IV   July 17, 2025

that's a different level of scrutiny on appeal when theory of defense instructions are denied.  So we just want to make sure that the record is clear that's what we're addressing.

MR. WINSTEAD:  And so is the proposal that this is in addition to 2.87 or substituted for it?

MR. GAINOR:  I think it's sufficient to be substituted for it because it includes all of the language.  If it doesn't, then we can incorporate that in to make sure it's not violative of any pattern.

MR. WINSTEAD:  So the substantive conspiracy instruction, you're wanting to label "Theory of Defense Instruction"?

MR. GAINOR:  Not for the jury, just for purposes of discussion here.

THE COURT:  I was confused about that as well.

MR. GAINOR:  I apologize.

THE COURT:  Well, that gets over my first hurdle.

MR. GAINOR:  Yeah.

THE COURT:  So what is the government's position with regard to the proposed language?

MR. WINSTEAD:  Your Honor, all of this information is contained elsewhere, and it just makes it confusing to have it restated here.  The indictment is included in the instructions. And so having all of that -- like none of the other substantive instructions have a copy of the indictment language in them.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

The point is to have a simple instruction just about the elements.

THE COURT:  Yeah, I think this is going to be very confusing and it's going to create questions or confusion that don't get raised with this --

MR. GAINOR:  So I have a fix.  I have a fix.

THE COURT:  Great.

MR. GAINOR:  Knowing that the parties are working so well, we are not invested in this and it's going so quickly. Let's take out the bullet points.  If the bullet points are taken out, then it clearly is not confusing.

THE COURT:  Let me look at the bullet points.  I don't see any bullet points.

Which bullet points are you referring to?  The ones that you have added?

MR. GAINOR:  Correct, and italicized.

THE COURT:  I see what you are saying, okay.

So tell us how you think this instruction should read, Mr. Gainor, with your fix.

MR. GAINOR:  It should read identical to what we have in front of us with the five bullet points gone.  That takes out the restatement concerns the government expressed.  Because those five bullet points, essentially, summarize and are redundant of what's in the superseding.  So to the extent that we take out those bullet points, the rest of the instruction we

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

believe is appropriate and consistent with the prior

instruction with the 924(c), specifically the very first plank,

which is going to be read right before to them -- to the jury.

THE COURT:  Do you have a position on this,

Mr. Winstead?

MR. WINSTEAD:  I do, your Honor.  If the defendant

wants a Theory of Defense instruction, that's not at all

appropriate to include in the elemental instruction.  It should

be a separate -- it should be a separate instruction that's

labeled -- that is clearly a theory of defense.  It's going to

be super confusing if this is perceived as you endorsing the

theory of the defense because it's in the elements.

THE COURT:  I agree.

MR. GAINOR:  So we can label it --

THE COURT:  I have a friendly amendment to your fix.

MR. GAINOR:  So far you're on a roll, your Honor, so

it's working.

THE COURT:  I would propose your tender be the

proposed language you have added to Pattern Instruction 2.87.

We label it as a theory of defense, but it would be without

those five bullet points because I think that's still

confusing.

MR. GAINOR:  That makes sense, your Honor.

THE COURT:  Mr. Winstead, do you agree with that fix?

MR. WINSTEAD:  I agree with that fix, but I still

think that some of the language goes beyond what is normally

permissible in the Theory of Defense instruction.

THE COURT:  Why don't you and Mr. Gainor confer on --

so here is what I'm going to rule thus far.  With regard to

Pattern Instruction 2.87, I am going to deny the tendered

language to modify instruction 2.87, and the Court will give

Pattern Jury Instruction 2.87 as it is, period.

However, the Court will allow the defendant to tender

a Theory of Defense instruction, which would follow 2.87, or we

would put it in another appropriate place, but it would be

titled "Defense Theory of the Case."  And Mr. Winstead and

Mr. Gainor will confer on that.  It will not include the five

bullet points in the tendered language at this point.  But you

will confer on the other language and let the Court know if it

needs to resolve something further.

MR. GAINOR:  It will be the first thing we work on

after we conclude, so we can at least get that to the Court.

THE COURT:  All right.  So moving on from there, that

takes us to the proposed instruction tendered by the defense

titled "Proof of Single Conspiracy Charged, Evidence of

Multiple Conspiracy."

It appears that the defendant is tendering this

instruction arguing that a multiple conspiracy instruction is

generally required when the indictment charges several

defendants with one overall conspiracy, but the proof at trial

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

indicates that some of the defendants were only involved in separate conspiracies and not in the overall conspiracy charged in the indictment.

I understand the argument, but I'm having a hard time getting there, Mr. Gainor.

MR. GAINOR:  Yes, your Honor.

THE COURT:  So I'll let you explain that.

MR. GAINOR:  So this is -- you are referring to our second theory of defense instruction.  We --

THE COURT:  Is that what it is?

MR. GAINOR:  Yes, your Honor.

THE COURT:  It is captioned "Proof of Single Conspiracy Charged, Single Conspiracy, Evidence of Multiple Conspiracies."

MR. GAINOR:  Correct, your Honor.  And that is what -- I apologize.  The filed copy does say, under Document 203, Page 7 of 7, "Proof of Single Conspiracy Charge (Theory of Defense Instruction 2)."  So the record is clear, it's another Theory of Defense instruction.

THE COURT:  All right.  Just so the record is clear, what you have tendered is a modified Pattern Instruction 2.20.

MR. GAINOR:  Yes, that's correct, your Honor.

THE COURT:  All right.

MR. GAINOR:  So what we have on the record is evidence, whether the jury accepts it or not, is that the drugs

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

in 333 were Anthony Quintana's, the weapons, the ammo. Then, in contrast to that, we have text communications that indicate that for some -- for lack of a better term, something is amiss in terms of activity, alleged activity between Ms. Foster and Mr. Meek and potentially other people.

If the jury can surely -- and there's enough evidence for this to go to the jury. But if the jury believes that Quintana's drugs were not Meek's drugs or Meek did not adopt those drugs and was using them, and in conjunction with Foster's testimony that Mr. Meek allegedly was very discrete in his drug activity and there's a lot of times she did not know what he was doing, then arguably, an explanation in the texts is that there is a separate conspiracy going on outside of what is connected to the house -- excuse me, the Apartment 333 in Counts 1 through 4.

That's why, even -- and the Tenth Circuit, Ninth Circuit, Third Circuit all are clear that just even the slightest amount of evidence could support a Theory of Defense instruction.

There's more here especially with the denials or at least the affirmative representations by Ms. Foster before she was looking at life.

THE COURT: So let me ask you one question. You have made clear this is a Theory of Defense instruction.

MR. GAINOR: Yes, your Honor.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

607

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

THE COURT:  Does it make sense to put this in with your other Theory of Defense instruction that we have just talked about and you are going to confer with the government about and just put it all in one Theory of Defense instruction?

MR. GAINOR:  I mean, that's something I didn't think about.  Can we discuss both --

THE COURT:  Yes.

MR. GAINOR:  -- with the government --

THE COURT:  Yes.

MR. GAINOR:  -- and see if we can work out a fix?

THE COURT:  Yes.

MR. WINSTEAD:  The only thing to add to that, your Honor, is this isn't, again, a Theory of Defense instruction.  It's a mixed instruction that has instruction on the law taken from that pattern, multiple conspiracies.

THE COURT:  Well, I agree with that.  So the way it reads now is it appears that the Court is instructing on something different and giving elements.  I think you could say it is the defense's theory in this case that there were multiple conspiracies and if you find there were multiple conspiracies, blah, blah, blah.  But I wouldn't want to give it necessarily as a multiple -- as an instruction with elements from the Court because there's only one conspiracy charged here, so I don't want it to be confusing.  I'm not saying you can't still put in front of the jury that this is your theory

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

and this is what they need to do if they believe that theory or they can find that theory or whatever.  But why don't the two of you chat and figure out a fix, because I think there is one here.

MR. GAINOR:  Yes, your Honor.

MR. WINSTEAD:  And your Honor, just to close the book on that, the government's position is that specifically the multiple conspiracies instruction isn't proper in this case.  And so if that sort of aspect of it is removed, then we can work on the statement of the case.

MR. GAINOR:  Well, the problem with that is that there is evidence of it.  And, again, Tenth Circuit has made very clear that the smallest amount is enough to get the instruction.  But I think that there's an opportunity to work out a fix, and I'd like to try.

THE COURT:  All right.  I'm going to give you that opportunity to try.

The Pattern Jury Instruction 1.31, no objection.

Knowingly, Jury Instruction 1.37, no objection.

Pattern instruction 17.07 would be next with regard to knowledge and intent.

MR. GAINOR:  Yes.

THE COURT:  The defendant has objected to this instruction.  I'll let you make your record, Mr. Gainor, on this particular instruction.

24-cr-00082-RMR   Jury Trial, Vol.IV   July 17, 2025

MR. GAINOR:  You know, interestingly, your Honor, in terms of the analysis from an appellate point of view on the word "knowingly," there's just such interesting case law with regard to it.  And when the Tenth Circuit agreed to the standard pattern instruction, which is articulated in 1.37, the thinking was to keep it short, but sweet.

With the government's addition under O'Malley, which is, again, using Mr. Winstead's words, not a pattern, the problem is that what we're doing is, I believe, defeating the intent of the Tenth Circuit by going beyond the clearly articulated, very well thought out and very much supported by case law knowing instruction that was just referred to.  So I guess they proceed at their own risk, but with the contemporaneous objections this is not a plain error review.

So, look, I think it's redundant, repetitive.  We have the fact that it's not a pattern and the prior instruction is agreed upon and sufficient.  So I'll stand on that record.

THE COURT:  Mr. Winstead.

MR. WINSTEAD:  Thank you, your Honor.  It is not a pattern instruction, but we believe that it's helpful.  We would encourage the Tenth Circuit to adopt it as a pattern instruction.  But in the meantime, it's a clear, accurate statement of the law, again, likely to obviate any potential juror questions and we don't think it's confusing or misstates anything.

610
24-cr-00082-RMR     Jury Trial, Vol.IV     July 17, 2025

MR. GAINOR:  When the Tenth Circuit formulated this knowing instruction, they considered whether there would be confusion.  They still came to the conclusion that a short but sweet instruction was appropriate.  So I appreciate Mr. Winstead's guidance to the wise judges of the Tenth Circuit, but they have already thought this out before his idea today.

THE COURT:  So with regard to the Jury Instruction 17.07 tendered by the government, which comes from O'Malley, the Court does recognize this is not a pattern instruction, but is instead taken from O'Malley Fifth Edition regarding knowledge and intent.

Although, generally, this Court does adopt and instruct only on pattern jury instructions, in this particular instance, this Court has previously considered this very issue and has found that this instruction is helpful and is appropriate.  The Court did give this instruction in the McGuire case, 22-CR-00080 and, if I'm not mistaken, I could entirely be mistaken, that case has already gone up on appeal and the Court has been affirmed on appeal in that.

The Court will give this instruction, but does note the defense's objection.  And the Court also notes its own deviation from its normal practice, which is to give just the pattern instructions.  But on this one, I do believe it is warranted.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Instruction -- I think this is Pattern Jury Instruction 1.39.  As modified, there's no objection.

Instruction 31 is also not a pattern instruction, but the Court will note that it has previously addressed this instruction.  Again, that was in the Beasley matter 23-CR-00342.

MR. GAINOR:  Which one are we referring to?

MR. WINSTEAD:  It's the investigative.

MR. GAINOR:  So your Honor, we have a fairly important record to make on this one.

THE COURT:  Hold on a minute.  I want to make sure we're on the same one.  All right.  This is different than the one I had yesterday.

Defendants, this is the instruction that defendant tendered just this morning very shortly before I went on the bench.

MR. GAINOR:  After about an hour of sleep, so I'm sorry for the late --

THE COURT:  Well, here is the thing, Counsel, and I will just say this, we had this jury instruction conference to address these instructions where the Court asked if there were any objections at that time, and these -- many of these objections could have been, probably should have been raised at that conference.  That's why we do that, so that we're not here the morning of when are you concerned about how much time you

have between getting your instructions in final and starting your opening statement.  That's why we do that.

At that time, it was represented to the Court that all of these instructions were stipulated to but there may be additional instructions that would be tendered.

MR. GAINOR:  Yes, your Honor.

THE COURT:  I have gone forward.  We are addressing all of these.

MR. GAINOR:  Yes.

THE COURT:  But I would ask counsel in the future, should you have another case before me, that we endeavor to address these in advance at the pretrial conference to the extent we can.  But I do think that some of these objections could be made -- or could have been made at that time.

MR. GAINOR:  And I apologize to the Court, your Honor. I think the problem sometimes with trial prep and these 12-hour days for both sides is we make mistakes as human beings.  And what I'm worried about, and I want to put this clearly on the record, that was a mistake not to raise this, but I don't think my client should be prejudiced by my mistake.

THE COURT:  That's why we're continuing this on.  And I am not even saying it was necessarily a mistake.  I'm just saying that try to do this before you're in the midst of 12- and 14-hour days of trial.  That's why we hold the trial preparation conference --

613

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

MR. GAINOR:  Yes, your Honor.

THE COURT:  -- well in advance and I ask you to consider those at this time.

MR. GAINOR:  This won't happen again, your Honor, when I have the honor of appearing before your Honor again.

THE COURT:  So to address this issue, it appears that you are not objecting to the version that the government has provided, but you want to add a second paragraph to that instruction.  I will, again, note for the record, this is not a pattern instruction, but it appears it is taken from the citation provided by the government in its proposal, in particular, United States v. Johnson.

The portion that the government has provided, the Court has previously instructed on.  As I have indicated, I have previously considered this and found it to be -- it is an appropriate instruction.

So the real question we're dealing with now is the tendered second paragraph that the defense has provided, which reads, "On the other hand, if you believe that certain investigative techniques should have been used that weren't, you may consider that failure to employ those investigative methods detracts from the credibility of the government's evidence."

So Mr. Gainor, you want to make a record on this?

MR. GAINOR:  Yes, your Honor.  So I find this to be a

fascinating issue, and I think what's fascinating about the primarily tendered case, which is Johnson -- and I had a laugh at the facts in certain respects because that was --

THE COURT:  Well, hold on just a minute.  Before you --

MR. GAINOR:  Launch into a diatribe.

THE COURT:  Well, fine.  I just want to know, from the government, are you objecting to paragraph 2?  If there's no objection, we don't need to do all this.  If you are, then we'll let Mr. Gainor continue.

MR. WINSTEAD:  As much as I would like to avoid that, we are objecting to that.

THE COURT:  I'm sorry for the interruption, Mr. Gainor.

MR. GAINOR:  No, I appreciate --

THE COURT:  Please continue.

MR. GAINOR:  I appreciate the question because it could have short-circuited it.  But just for the record, this is probably the last objection that we're deal with here, so I think the Court is running a tidy ship in terms of getting us out of here.

So the Johnson facts are fascinating, because it's about an individual that goes in and robs a bank, takes the money and a dye pack explodes.  And the issue on appeal was you didn't test that dye pack when it was all over him, the money,

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

the bag and his wallet.  I get it.  That was a case where the investigative technique was unnecessary.

In this case, we have literally, if you look at the ammunition piecemeal and all of the exhibits, you probably have a thousand opportunities to use science to confirm that Mr. Meek was connected to drugs, ammo and guns.  Now, that was not done.  Well, actually, there was evidence in discovery that there were swabs for DNA.  The government chose not to put that into evidence.  So the analogy and the disparity, in terms of Johnson and this case, is clear.

But the Johnson court goes further.  Because there wasn't a particularly -- I don't know, I mean, maybe defense counsel didn't make an argument in Johnson that differentiated or clearly did not have a clear basis to argue other investigative techniques, the Johnson court says in the highlighted language -- I think it's on Page 6 that the Court has -- and this is right out of the opinion -- "This does not prevent the jury from concluding that the failure to employ certain investigative methods nevertheless detracts from the credibility of the government's evidence."

So I'll point out for the record that the Johnson language is what we want to add.  It talks about the converse and provides balance in the instruction.  Because without it, it just creates the appearance that the jury could take away -- and I think this ties into the reasonable doubt argument.  We

all know intuitively that reasonable doubt can arise from the evidence, the lack of evidence or the conflict in evidence. That's just intuitive.  It's going to be argued to the jury. And in this case, by having this instruction unaltered without the balance converse language in that added paragraph, we are not only not accurately stating to the jury the holding of Johnson, which is the primary case cited by the government for this non-pattern instruction, but we're also treading on the idea of burden of proof, proof beyond a reasonable doubt, which is the primary tenets, I'm sure everyone would agree, in the criminal justice system.

So what we're doing, and it's a simple fix, I'm not objecting to it.  I'm withdrawing my objection to the instruction.  Because I think from, again, intellectual honesty, I have to follow what this Court has done, what this jurisdiction has done and what the other case law says.  But without adding this counter balancing language, we're creating an issue, especially in this case, that the scientific aspects of what were not done is such a primary argument of reasonable doubt that we are also treading necessarily and improperly on and creating confusion in terms of the reasonable doubt instruction.  So that's basic Fifth Amendment due process.

What we're doing at this particular point is implicating, by not including this language, a substantial right, which also invokes the Fifth Amendment analysis, which

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

is properly preserved.  So there's no plain error analysis if this instruction is not added the way the defense requests, but it also triggers a lower bar for analysis because we are treading on a Fifth Amendment violation here.

THE COURT:  All right.  Mr. Winstead.

MR. WINSTEAD:  Thank you, your Honor.

I think the fact that the defense argument began by outlining the evidence in this case and their theory makes it clear that they're wanting to include this sentence simply to bolster their theory under the guise of instruction on the law.

That sentence, in Johnson, the Court is discussing the propriety of precisely the language that's tendered, which is clear and neutral and allows the jury to properly consider the information that the defense is wanting it to consider.

The sentence that they're wanting to insert is not a statement about the law in the opinion, but it's a prediction about what a jury might do after getting a clear statement of the law, and therefore, it's entirely improperly suggestive that a jury should consider that to detract from the government's case.

MR. GAINOR:  Or may consider that that language can be made into permissive.

But the interesting thing about the Johnson court is that they go further by their analysis and the instruction and the acumen on the instruction was never made with the inclusion

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

of the second paragraph.  So then it became an analysis of was it an abuse of discretion?  And as the Court knows, well, better than we do, that analysis is a very tough one to overcome.  But we think we now, by adding the Johnson language, create more of an issue on appeal, and we think it's a very, very, very appropriate issue.  It balances out.  And I don't mind changing the language to "may" or making it more permissive, but without that, you have a very one-sided instruction.

And if defense counsel doesn't object to it in Johnson and they do it under an abuse of discretion standard, they have to live with it.  We don't intend to go through that analysis in front of the Tenth.  We're going to make it a different issue or not issue, depending on what the Court does.

THE COURT:  Well, there are two things here.  One is I certainly hear your argument and that to me sounds much more like a closing statement argument as opposed to an argument about the instructions.  What you're asking the Court to do is to specifically tell the jury that if you don't think investigative methods that could have been used were used and that's a problem, then you --

MR. GAINOR:  May.

THE COURT:  -- may consider that the failure to employ those investigative methods detracts from the credibility of the government's witnesses.

24-cr-00082-RMR      Jury Trial, Vol.IV    July 17, 2025

MR. GAINOR:  Can we add "may not," then, right after?

THE COURT:  Hold on.  Let me finish my thought, but I appreciate you offering suggestions here.

It seems to me that that language there is really implicit in what is said in the instruction.  So what the Circuit was commenting on in Johnson was the way that the jury may interpret this or what they may do.  Again, we instruct the jury that they are the sole finders of fact and that they determine credibility.  And that, to me, that credibility instruction along with this instruction as it exists now, and that has been expressly approved by the Circuit, is the appropriate way to approach that.

I will tell you, fair enough, I think your argument is a fair one, but I think it's an argument -- it's really an argument, versus an instruction, and should be left to argument by counsel as opposed to a specific instruction by the Court that could be some what confusing here.  And I do think that this instruction adequately addresses the issue, which is why I have given it in the past.  This Court has specifically adopted this instruction and I will give it again here, but without the additional language.

That said, you made your record and you may make the case that the Circuit says, yup, that language makes sense and we shall see.  I always learn things and we all learn things from these cases, so I understand that.  But I do not think

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

that it is appropriate to give in this particular instance and it is not appropriate to add at this time.

MR. GAINOR:  Your Honor, just so the record is clear, we would offer and tender like we did earlier to change the wording to "may or may not" to make it more neutral.  But, again, the Johnson court decided this looking at the fact pattern of Johnson.  So that was a ridiculous investigative technique that was not done.  Clearly, this is different here.

THE COURT:  I don't -- I know that's your argument that it clearly wasn't, and I leave it to you to make that argument.  But I don't know that I can find that this is something that clearly should have been done under the circumstances here and wasn't.  So I don't -- I'm not finding that your argument is not meritorious in any way, shape or form, but I think that it's not sufficient for this Court to add the second paragraph language at this time.

With that, that brings us to Instruction 1.3, similar acts.  I just note this instruction that the Court will give is the instruction that the Court already read prior to the testimony of Detective Ray.

However, the defendant's proposed tendered instruction is of record and the defendant's objection to the Court's instruction as given already and that the Court will give again as these instructions is noted.

MR. GAINOR:  Can I briefly supplement, your Honor?

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

Because the 404(b) and the 2018 case is going to be a primary issue if it goes up on appeal.

THE COURT:  You can supplement.

MR. GAINOR:  And the problem is --

THE COURT:  Briefly.

MR. GAINOR:  -- that the government had said that accident or absence of mistake was the basis of 404(b).  And we also know from the case law in the Tenth Circuit that the laundry list of other justifications should not be added to the instruction.  The government should be held to their proof with regard to what they're saying the 404(b) is valid for.

And this harkens back and ties into the fact that this defense has changed and morphed over time to not dispute the text messages, but to dispute ownership of what was in 333, making the 404(b) unnecessary.

With the laundry list of justifications for 404(b) that don't include or are inclusive of justifications beyond what the government has articulated, which were removed once the defense changed, it is our understanding then -- and I just want to make it clear that sua sponte, the Court noted on the record, there could be other reasons for inclusion of 404(b) and I'm going to allow it in.  That's been clearly objected to the record is clear, but all of this ties into the effect of this evidence.

If this jury convicts, we believe it's likely the

622

primary reason is because of the inclusion of the 2018 case, which was unnecessary.  By having this laundry list in, beyond what the government justifications were for it, we believe it's improper.  The record is complete and we can move on from there.

THE COURT:  Mr. Winstead, do you want to make any statement in response?

MR. WINSTEAD:  Just, your Honor, I'm not sure where this -- it's cropped up several times but the assertion that the accident and mistake related to whatever is the only allowable purpose, the government offered it for the additional purposes and the Court allowed it at the hearing.  And so I believe that it's all consistent with that and appropriate.

THE COURT:  Moving on, the next one would be stipulations.  We have included the stipulations.  I will ask you all to review the final version with Ms. Keast-Nachtrab for typos and other things.  We have included the additional stipulations related to the stipulations that the parties entered into with regard to the 2018 crime.

I'm going to ask you to each review the final versions of all of these to make sure that they are consistent with what we have agreed to thus far.  I think that covers everything now.

MR. WINSTEAD:  Your Honor, one that I wasn't sure if it was in the list that the Court was going through, there in

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

the middle we had tendered an instruction entitled "Methamphetamine Mixture and Actual," it's also, once again, we're falling afoul of including a non-pattern instruction, but it's basically just an explanation for what that means.  That was on Page 27 of the government's --

THE COURT:  Was there any objection to that, Counsel?

MR. GAINOR:  May I take a look at it, your Honor?

MR. WINSTEAD:  There wasn't any objection noted to it in that --

MR. GAINOR:  I appreciate Mr. Winstead speaking on my behalf to save my vocal cords.  Let me just take a look.

I have no objection to this.

THE COURT:  All right.  Do you have that instruction, Ms. Keast-Nachtrab?

Great.

Anything else?

MR. WINSTEAD:  Other than correcting some typos afterwards and those conferrals, nothing else from the government.

MR. GAINOR:  Again, other than working with the government on the Theory of Defense instructions, we'll get to that right now.

THE COURT:  Very well.  We'll get a final -- you-all confer on those two instructions.  We will finalize the instructions.  We will -- we won't be able to do numbers yet

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

624

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

until we have a final version from you-all, but then we'll put numbers on it.  So we'll have it, then we'll get the final version to you.  You'll do one last read through to make sure everything is in order and then we'll get ready to argue to the jury.

We'll be in recess.  Thanks everyone.  Oh, no, we're not in recess.

We need to do two other things.  We need to do the advisement to Mr. Meek and then you can renew your objection, Mr. Gainor.

So it's my understanding that you are still requesting that the Court give a Curtis advisement to your client, Mr. Gainor.

MR. GAINOR:  I am, your Honor.

THE COURT:  So have you had -- I want to talk to you, Mr. Meek, for a moment.  It's my understanding that there's been a decision made that you would not testify in this matter.  But before you finally make your decision, I want to talk to you for a moment about your right to testify in this case.

Have you had a chance to discuss your right to testify with your attorney?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And do you understand that you have the right to testify in this case or not to testify, but at the end of the day, the decision about whether to testify or not to

testify is yours?  Do you understand that?

THE DEFENDANT:  I do.

THE COURT:  Now, I want you to know that no one can prevent you from testifying in this case, okay?  And if you testify, the prosecution will be allowed to cross-examine you. If you have been convicted of a felony, which we, from the evidence in this case, know that you have been, the prosecutor will be entitled to ask about it.  It would not only be the 2018 conviction, but it could be other felonies.  I don't know if you have others or what -- you know that better than I do. But they could ask about others, if there is a proper purpose.

The purpose of this advisement is just to make sure you understand your right and the consequences of you deciding to testify or not to testify.

Do you understand this right, Mr. Meek?

THE DEFENDANT:  Yes, I do.

THE COURT:  Do you feel you need to confer with your attorney any further before you make this decision about whether or not you will testify in this case?

THE DEFENDANT:  No, I do not.

THE COURT:  And you have been present here for the course of the trial and you had access to your attorney.

Do you have a decision about whether or not you would like to testify in this case or not -- or let me change that word.  It is not whether you would like to.  Whether you will

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

or will not.

THE DEFENDANT:  I will not be taking the stand.  Thank you.

THE COURT:  Is this your decision?

THE DEFENDANT:  It is.

THE COURT:  And do you make this decision freely and knowingly?

THE DEFENDANT:  I do.

THE COURT:  Mr. Gainor, is there anything further regarding the advisement?

MR. GAINOR:  Other than inquiring of Mr. Meek as to whether at this point he is satisfied with the services of counsel with regard to having this discussion.

THE COURT:  I don't normally ask that, but at your request, I will do that.

Are you satisfied with the advice that your attorney has provided and the discussions you have been able to have with your attorney about your decision as to whether or not to testify?

THE DEFENDANT:  I am.

THE COURT:  And have you had an opportunity to fully discuss these matters and have you gotten all your questions answered?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And so based on that, do you feel that you

are fully capable and have been fully advised as to your decision in this matter?

THE DEFENDANT:  Yes.

THE COURT:  Anything further, Mr. Gainor?

MR. GAINOR:  No, I think that covers it, your Honor.

THE COURT:  You can make your argument.

MR. GAINOR:  Your Honor, in the interest of being efficient, but also being complete, with regard to the defense, we will rest, if we haven't already announced that.  I believe we did.

THE COURT:  I don't believe you have rested before the jury.

MR. GAINOR:  Right.  So I will rest in front of the jury, if the Court is so inclined.  But then to save the Court time, I will just reassert, at this particular point with the Court's permission, all of the grounds, motions, objections, motions for mistrial that were previously articulated at length during the first Rule 29, and if that's acceptable to the Court, instead of going through each one as a defense decision, I don't think it's necessary, so I'll just keep it truncated and just re-allege what I have alleged in the first part of the Rule 29.

THE COURT:  That is sufficient.  And the Court, now being clear that the defense will rest, will address the motions for mistrial and for Rule 29.

24-cr-00082-RMR      Jury Trial, Vol.IV     July 17, 2025

A District Court may appropriately grant a mistrial only when a defendant's right to a fair and impartial trial has been impaired, United States v. Caballero, 277 F.3d 1235, Tenth Circuit, 2002.  The Court must consider the prejudicial impact of the alleged error in the context of the entire case, United States v. Gabaldon, 91 F.3d 91, Tenth Circuit 1996.

At this stage, the Court has received all of the evidence in this case and is in the position to evaluate the alleged potential for prejudicial impact, or, as the defense has asserted, the in fact prejudicial impact of several errors in this case.  Having received all of the evidence, the Court can now evaluate that in the context of the entire case.

During the course of the trial, the defendant has raised four oral motions for a mistrial and has reasserted those motions at this time.  I'll address each in turn.

The first motion for mistrial was made when the prosecutor, Mr. Winstead, asked a question to Detective Arvizu to which Mr. Arvizu made a reference about Mr. Meek's violent history.  The question was:  "In your relationship with her" -- referring to Ms. Foster -- "was she hesitant to provide information in this case?"

His answer was:  "Yes."

"Question:  Did she tell you why she was afraid?

"Answer:  Yes.

"Question:  As the investigator in this matter, were

24-cr-00082-RMR      Jury Trial, Vol.IV    July 17, 2025

you able to determine why she was afraid?

"Answer:  Yes.

"Question:  Why?

"Answer:  It was because of Mr. Meek's violent history."

Mr. Gainor objected at that time.  "Objection, 403, reserve a motion at this time."

"The Court:  Overruled and your motion is reserved."

Mr. Meek argues the question was designed to elicit an answer that was calculated to prejudice the defendant, and that once the lead detective mentioned the violent history, that prejudice could not be undone.

During the pretrial conference, the Court ruled that the government was not to introduce the domestic violence arrest warrant or, quote, "those type of things" at trial. However, as it relates to Ms. Foster, the Court ruled that if Ms. Foster was challenged on why she changed her story, she could testify as to why she changed her story, which may include being afraid of Mr. Meek because of past instances of domestic violence.

While Mr.  -- or Detective Arvizu did not specifically refer to domestic violence, the argument is that this statement ran afoul of the Court's prior ruling and was prejudicial to Mr. Meek.

The request for a limiting instruction or request to

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

strike the statement was not made at that time.

Now, as the Court sits here with all of the evidence having been received in this case, the Court does recognize that during the cross-examination of Ms. Foster, the defendant solicited information from Ms. Foster about domestic violence between her and Mr. Meek.  The defense forthrightly and candidly admitted that it had then opened the door to allow evidence of the topic of domestic violence and the domestic violence arrest warrant.  But the door was opened by the defense on that issue.

While the Court does view Detective Arvizu's statement as potentially prejudicial to the defendant, it was not something in this Court's estimation that could not have been addressed by either striking the testimony or a curative instruction.  The Court will give limiting instructions as part of the instructions.  And that, coupled with the specific address of this issue with defense counsel, it appeared that this was not an oversight in not requesting a limiting instruction, but part of the strategy in not wanting to call further attention to it at that time.  And the Court respected that and still respects it.

But at this time, given all of the evidence that has been admitted in this case, the Court does not find that that lone statement was sufficient to deprive Mr. Meek of a fair trial and due process in this matter, and therefore, on that

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

basis, the Court overrules that motion for mistrial.

Secondly, in a second motion for mistrial, Mr. Meek alleged that Detective Arvizu was testifying as an FRE 702 expert witness without proper notice and in violation of that rule.

The government did not disclose Detective Arvizu as an expert witness.

Mr. Meek argues that Detective Arvizu's response to Mr. Winstead's questions regarding terms used in text messages between Meek and others constituted scientific, technical or other specialized knowledge so the witness must be qualified as an expert in order to render under Rule 702.

The following is an example of the objected to testimony:

"Question:  Is, quote, 'hundred pack' something that is commonly distributed in the drug world?

"Mr. Gainor:  Objection, 702.

"The Court.  Overruled.

"The Witness:  Yes.

"Question:  What is it?

"Answer:  100 pills.

"Question:  What kind of pills?

"Answer:  Fentanyl.

"Is $200 a reasonable price at this point in time?

"Yes."

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

In evaluating the motion for mistrial, in the first instance, the Court determines whether an error was made. Here, this Court finds that there was no error.  I specifically instructed that Detective Arvizu was testifying under Rule 701 based on his testimony in his particularized knowledge derived from his position as a lead detective in the investigation. His testimony was not based on 702.

The Tenth Circuit reached a similar conclusion in United States v. Dermen, 23-4074 WL -- I'm sorry, 2025 WL 1889280 at 45 to 46, in its opinion, July 9th of 2025, finding that the District Court did not abuse its discretion in admitting a law enforcement officer's testimony because the testimony did not transcend elementary mathematical operations or require technical or specialized knowledge to execute, but rather, testified based on his particularized knowledge derived from his experience as an investigator in this case.

That being said, the Court does recognize that the Court also admitted 702 testimony by Detective -- I'm forgetting his name.

MR. GAINOR:  Jeffers.

THE COURT:  Jeffers, thank you, as a blind expert witness, indicating that that testimony would provide assistance to the jury in regards to information that was not within the common knowledge of the average juror.  It's not the same as evidence that would be known by an investigator as the

lead investigator or derived by the lead investigator in his investigation.

However, even if one were to disagree and believe that Detective Arvizu's testimony crossed the threshold from lay to expert testimony, the error, in this Court's opinion, did not impair Mr. Meek's Constitutional right to a fair and impartial jury.

The government disclosed Detective Jeffers and the issues he would address as a blind expert in its 702 disclosure.  The defendant cannot claim he was not put on notice or surprised to hear testimony regarding certain drug terms and the cost of the drugs.  Indeed, the defendant argued that that testimony could be provided by other witnesses, such as Ms. Cruz or Ms. Foster.

Additionally, while the defendant could also argue that this evidence is cumulative, and indeed it may be, however, in this Court's estimation, it was not prejudicial to the ultimate fairness of the trial on behalf of the defendant, and, therefore, the Court overrules the mistrial motion on the basis that Detective Arvizu was improperly allowed to give expert opinions.

The third oral motion for mistrial dealt with a Fifth Amendment argument made when the video of Detective Felice's body camera was played with audio.  The video was of the arrest of Mr. Meek, and in the video, Defendant asserts that Mr. Meek

24-cr-00082-RMR     Jury Trial, Vol.IV     July 17, 2025

invoked his right to remain silent.  But after that, Detective Felice is heard on the video asking Mr. Meek what he would like him to do with the keys around his neck.  Mr. Meek responds by asking him to toss the keys onto a balcony of an apartment.

Mr. Meek argued that playing any portion of the video after he invoked his right to remain silent was a violation of his Fifth Amendment.

After this objection, the government agreed to play the rest of the video without audio.  Therefore, the remaining audio on the video, any objection to that as a violation of Fifth Amendment, is moot as defense counsel has already acknowledged and forthrightly indicated is not really at issue.

The question is whether or not the statement by Mr. Meek to toss the keys onto the balcony of the apartment was sufficiently prejudicial to have deprived Mr. Meek of a fair trial.

The Court has to read between the lines here to find exactly what the prejudice would be, but it is believed that the comment regarding the keys, defense believes could tie Mr. Meek to Apartment 333.

However, again, the Court has to -- even if it were to believe that this was an error for this to be admitted, A, there could have been an instruction to disregard at the time and to strike at the time.  However, again, in deference to

24-cr-00082-RMR     Jury Trial, Vol.IV     July 17, 2025

defense's strategy and discussions off the record, one, this was an admitted exhibit that was admitted by stipulation.

The Court takes to heart the argument that there was a miscommunication and the defense believed that there would be no audio.  And assuming that to be the case and giving all benefit of the doubt on that issue to the defense, the Court reviews that objection.

Again, a limiting instruction or striking could have been done, but, again, in deference to strategy and not wishing to call further attention to the issue, the Court did not give that.  The Court will give the limiting instructions as a part of the closing set of instructions.

However, even assuming that that should not have been admitted, the Court still must evaluate whether or not that interaction on the video and that brief statement was prejudicial to the defendant sufficiently that it denied him a fair and impartial trial.

Here, there are multiple other pieces of evidence throughout the trial that was introduced which associated Mr. Meek to Apartment 333.  The Court readily acknowledges there was other evidence introduced in the case and argument will be made that Mr. Meek was not associated with Apartment 333 or that some other person was the owner of the guns and drugs found in that apartment, but the real question here is, did that statement about putting the keys on the

24-cr-00082-RMR     Jury Trial, Vol.IV     July 17, 2025

balcony prejudice Mr. Meek to the extent that he is not receiving a fair trial here, and I view that in the context of all of the evidence in this case.

There is evidence in the video that is not objected to, that Mr. Meek was seen walking out of the apartment building on the drone video of the arrest.  Ms. Cruz testified she visited Mr. Meek in the apartment.  And there is evidence of photographs of Mr. Meek in the apartment that were forwarded to the agent by Ms. Cruz.

Ms. Foster testified that the drugs and guns found in the apartment belonged to Mr. Meek and that he stayed at the apartment at different times.

During the search, there was mail with Mr. Meek's name found in one of the bags searched in the apartment.  Certainly, this evidence and the witnesses were subjected to strenuous cross-examination by the defendant.

The Court does not view this as a conclusion, but rather that evidence was presented on this topic.  Thus, viewed in the totality of the case and the evidence presented, the statement about the keys did not rise to the level of impairing -- being so prejudicial as to impair the defendant's Constitutional right to a fair and impartial trial.

Finally, Mr. Meek argues that mistrial is required because Ms. Foster stated on the record indicating Mr. Meek was supposed to plead guilty to the offense charged.  Ms. Foster

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

testified that she thought Mr. Meek was going to take a plea.

"Question:  Is part of that plea agreement that you agreed to provide testimony like you are doing today?

"Answer:  Yes.  I was under the understanding he was going to take a plea agreement so I wouldn't have to do this. That's not what happened.

"Mr. Gainor:  Objection, your Honor.  Reserve a motion.

"Court:  Overruled.

"Mr. Winstead:  If you say anything today that's not true, would that violate the terms of your agreement?

"Yes, I am facing 20 years."

Mr. Meek's counsel concedes that he did not think that the prosecutor intended on eliciting the utterance from Ms. Foster.  Instead, Mr. Meek argues that the statement planted in the jury's mind that Mr. Meek was going to acknowledge his guilt.

This Court notes that a similar case, United States v. Wells, 739 F.3d 511, Tenth Circuit 2013, provides some guidance to this Court on the issue.  There, the Tenth Circuit held that the District Court did not abuse its discretion in denying the defendant's request for a mistrial after the cooperating witness testified about the possibility that the defendant had entered into a plea agreement.

There, the Court used a three-part test for evaluating

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

the claims that although not styled as ones of prosecutorial misconduct involved the prosecutor asking a question, the witness answer in a potentially improper way.  That was the test articulated in United States v. Meredith, 364 F.3d 1181, Tenth Circuit 2004.  The three-part Meredith test considers the following:

One, whether the prosecutor acted in bad faith;

Two, whether the District Court limited the effectively improper statement through its instruction to the jury; and

Three, whether the improper remark was inconsequential in light of the other evidence of the defendant's guilt.

Here, again, there's no indication that counsel for the government intentionally elicited from Ms. Foster testimony regarding the possibility that Mr. Meek was considering a plea deal.

The evidence -- the defendant did not request a curative instruction and, therefore, none was given, as previously indicated by the Court, the reasons therefore.

Defense counsel represented that his strategy and understanding after doing this for a couple of years is you can't get the genie back in the bottle and to do a curative instruction does exactly the opposite, it highlights.  Respecting this, the Court did not give that curative instruction at the time.  But again, the instruction will be

24-cr-00082-RMR      Jury Trial, Vol.IV    July 17, 2025

included as part of the closing instructions.

The review of the entire record, though, demonstrates that Ms. Foster's brief statement about the possibility of Mr. Meek considering a plea deal is inconsequential or limited in light of the other evidence presented at trial.  It will ultimately be up to the jury to determine what they conclude based upon the evidence as a whole.

Even viewing all four bases for mistrial that have been asserted by the defendant, the Court still cannot conclude that individually or collectively such arguments constitute or rise to the level of the deprivation of a fair and impartial jury by the defendant.  Certainly, the Court recognizes that the defendant disagrees and the Court respects that, and other people will have an opportunity to have another look at this as well.

With that, we will be in recess.

MR. WINSTEAD:  I'm really sorry, your Honor.  May I just do one really quick, not an argument, just a supplementation, just for purposes of the record?

THE COURT:  Yes.

MR. WINSTEAD:  Your Honor, when you were speaking about the first motion for mistrial, I believe just one time the Court accidentally, I believe, said that Detective Arvizu was talking about his conversations with Ms. Foster.  But it was actually Ms. Cruz.  I believe that was just a misstatement.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

THE COURT:  Thank you.  I accept that correction.

MR. WINSTEAD:  Thank you, your Honor.

And then the last thing, which I really should have put on the record when we were arguing this issue before, but that I would like to right now is, when Detective Arvizu said that, it was not the intention of the government to elicit that.  There was extensive conversations that the detective had had with Ms. Cruz throughout the course of the case where she expressed extreme fear about other people doing some sort of reprisal on her for being a snitch.  That's what I was trying to elicit and that's what I thought the detective would say.  So it surprised me when he said what he said.  I just wanted that to be on the record.

THE COURT:  We will be in recess.

THE DEPUTY CLERK:  Your Honor, there was one exhibit that was inadvertently admitted in a block of exhibits, Exhibit 265 that does not exist.  We wanted to clarify for the record.

THE COURT:  So exhibit 265, all sides agree was inadvertently admitted?

MR. MCINTYRE:  Yes, your Honor.

MR. GAINOR:  Yes, your Honor.

THE COURT:  The admission of Exhibit 265 will be stricken, since it doesn't exist, and the final record will not include Exhibit 265.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

24-cr-00082-RMR   Jury Trial, Vol.IV   July 17, 2025

MR. MCINTYRE:  Your Honor, what time are we back?  Are we back at 11:00?

THE COURT:  11:00, yes.

(Recess)

THE COURT:  So we have reached an impasse, it sounds like, with regard to the defense's proposed Theory of Defense instruction.  My clerk had forwarded to counsel the Court's proposal with regard to this instruction.

Where are we on that?

MR. GAINOR:  We agree with it and we'll ask for it.

MR. WINSTEAD:  We have the same objection to that second paragraph just as misstating the law about the -- it's a misstated --

THE COURT:  The second paragraph of which instruction?

MR. WINSTEAD:  Of the Court's Proposed 1.

THE COURT:  Paragraph 2 that reads, "Mr. Meek has argued that the controlled substances subject of Counts 1 through 4 were not his and that he was not a member of a conspiracy to distribute them," What is incorrect about that?

MR. WINSTEAD:  I'm sorry, your Honor.  What I'm looking at is "Mr. Meek asserts that Count Seven of the indictment alleges a conspiracy between Mr. Meek and Ms. Foster relating to the distribution of the specific controlled substances charged in Counts One through Count Four of the superseding indictment, such that the superseding indictment

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17,
2025

alleges that the object of the conspiracy is to distribute the

drugs in Counts 1 through 4."  That's legally erroneous.

THE COURT:  Do you have a counterproposal that is

legally not erroneous?

MR. WINSTEAD:  This is just an argument that they can

make, but it's just not what the superseding indictment says.

It's attempting to improperly limit the superseding indictment

to only relate to the specific substances.  And I mean, for

that matter, Counts 1 through 4 don't specify specific

substances.

THE COURT:  But this is a theory of the case, a theory

of the defense instruction, and that instruction says at

paragraph 2, "Mr. Meek asserts."

That's what -- that is what they're arguing, isn't it?

MR. WINSTEAD:  I guess what I'm saying is it seems

like they're making a legal argument rather than a factual

argument.  And the legal argument, I think, is just obviously

incorrect and it's not appropriate to submit to the jury.

MR. GAINOR:  It's not a legal argument, it's a factual

argument based on a plain reading of the indictment.

THE COURT:  Well, what if we change it to "Mr. Meek

makes the argument that Count Seven of the indictment alleges a

conspiracy between him and Ms. Foster relating to the

distribution of specific controlled substances charged in

Counts 1 through 4 in the indictment, such that the indictment

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

643

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

alleges the object of the conspiracy is to distribute the drugs in Count 1 through 4.  You are instructed to interpret the indictment based on the plain language of the indictment"?

That's their argument and you, ladies and gentlemen, need to read the indictment in the way a normal person would.

MR. WINSTEAD:  Sure.  I think I may have misunderstood a little bit of this, and there may be a clarification.

Can I ask my co-counsel really quick?

THE COURT:  Yes.

(Conferring.)

MR. WINSTEAD:  So I may have just sort of misunderstood some ambiguities here.

Can we just instead of saying "to distribute the drugs in Counts 1 through 4," can we just say "to distribute" and then list the drugs that are in 1 through 4?

THE COURT:  Yes.

MR. WINSTEAD:  It's methamphetamine and --

MR. GAINOR:  That's not the theory of my defense.  I appreciate that the government wants to argue the theory of my defense, but we would object to that.  That is not appropriate.

THE COURT:  Well, is that inconsistent with your defense?

MR. GAINOR:  That would be potentially inconsistent with my defense.  So we can label it --

THE COURT:  The drugs as identified in each count, 1

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

through 4.

MR. WINSTEAD:  What about if it just said to distribute the types of drugs.

MR. GAINOR:  No, we would object to that.  That's a different way of saying it.  And the fact that we're asserting it, it's a theory of defense.  The government can argue against it, but we're allowed to --

THE COURT:  I am going to make it very clear that this is Mr. Meek's argument.  Defendant can say that's an argument, but, again, the instruction says, you, ladies and gentlemen, are to be the ones that decide this and read the plain language of the superseding indictment.  I don't know how much more clear that can be.

(Conferring.)

MR. WINSTEAD:  So I think the place where the legal confusion comes through is that when it says here "to distribute the drugs in Counts 1 through 4," it's ambiguous whether that means the types of drugs that are charged in Counts 1 through 4, and they are the same types of drugs, or if it means specific like Government Exhibits or something like that; right?  And that's really ambiguous.

THE COURT:  I don't understand.

MR. WINSTEAD:  So I think what the theory of the defense is, essentially, even though there's all of this drug trafficking from the phone, and even though there's other

controlled substances in the case, they're saying Count Seven of the indictment is related to the specific items that were found -- only the specific items that were found in the apartment; right?  And that's where it is sort of ambiguous.

We would agree that Count Seven certainly states the drugs and they're the same drugs that are charged in Count 1 through Count Four, if we're talking about types of drugs.  But if we're talking about the specific drugs, the whole reason why there's a period of time specified for the conspiracy as opposed to the possession with intent to distribute, which is the 18th, is that there's lots of other drugs too, and there's nothing in the indictment, even under any plain reading that would somehow limit the indictment charge to just the things that were found in the apartment.

If the jury is allowed to misunderstand that and sort of be legally misled about what the limits on the indictment are, then they could discount all of the evidence about prior drug distribution.  And, again, that's not a question of fact, that's a question of law that the jury instructions are supposed to dispel.

So in other words, the defense theory, if it's articulated here, if that's what they mean, is directly contrary to the other instructions.  That's why we think it's just impermissibly confusing.  And honestly, if the defendant argues that, it seems like they're just trying to do jury

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

nullification by a legally erroneous theory.

MR. GAINOR:  Well, that's interesting.  Because then the Tenth Circuit is completely wrong by having a multiple conspiracy instruction as a pattern, which is connected to this.  This is a Theory of Defense instruction where we are asserting it.  The jury is free to regard it or disregard it at will, but that's the nature of the Theory of Defense instruction.

Essentially, Mr. Winstead's argument is that a multiple conspiracy argument, in essence, is jury nullification.  That is completely wrong, completely inappropriate and contrary to the Tenth Circuit.

THE COURT:  Well, all he's saying, as I hear it, is you can't invite them to make a finding contrary to law.

MR. GAINOR:  Which we would never do.

THE COURT:  And he's just trying to clear up that possibility, which you would want, as you're not going to try to invite them to make a finding that's contrary to law.  So it seems to me there's got to be a way we can clean this up so it's still the defendant's theory.

Because the defendant is entitled to make their assertion.  It's their argument.  But the defendant is not arguing an outcome that's contrary to law.  So we need to put in a statement here that's not contrary to law.

So that's why I'm asking you, Mr. Winstead, what would

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

647

24-cr-00082-RMR     Jury Trial, Vol.IV     July 17, 2025

be a statement here that isn't contrary to law that we can include?

I mean, if we just say "to distribute drugs," period, as to distribute drugs as alleged in the superseding indictment at paragraphs blah, blah and blah, blah, then you guys can make your arguments about it in closing.  It specifically says you've got to look at the superseding indictment, and as it's alleged there, that would be what they would have to find was the object of the conspiracy.  And then they are specifically instructed to interpret the indictment based on the plain language of the indictment.

MR. GAINOR:  Your Honor, what's concerning to me is that the government has complete control, as they should, of the charging process before the grand jury.  They sit down, they draft an indictment, they get a true bill, and then essentially, by their argument, they want to argue that we are not able to be able to assert to a jury that the subject matter of Counts 1 through 4, which are mentioned by drug and by amount, which are identical to those counts, we cannot argue that the conspiracy is connected to relating to those counts, and that we cannot argue a multiple conspiracy outside of that, a separate conspiracy.

THE COURT:  No, it's set forth in the other paragraphs in the next page.  Mr. Meek has argued that the controlled substances subject of Counts 1 through 4 were not his and that

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

648
24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

he was not a member of a conspiracy to distribute them.  If you find that Mr. Meek was not a member of a conspiracy charge, then you must find Mr. Meek was not guilty, even though Mr. Meek may have been a member of some other conspiracy.  This is because proof that Mr. Meek was a member of some other conspiracy is not enough to convict, but proof that Mr. Meek was a member of some other conspiracy would not prevent you from returning a verdict if the government proved beyond a reasonable doubt that he was also a member of the conspiracy charged in the superseding indictment.

MR. WINSTEAD:  And your Honor, with that clarification, that totally makes sense.  And it seems like what the defense theory, if it were sort of simply stated, it would just be, the defense contends, first, that he didn't possess the drugs found on the 18th, and, second, if he was a member of a conspiracy, it was a different conspiracy, or some sort of statement of the alternative conspiracy.  It seems like that's a concise statement of the defense theory that doesn't invite confusion on the law.

THE COURT:  I'm not sure what you just said.

Are you suggesting a change to what I just read or are you agreeing with what I just read?

MR. WINSTEAD:  I'm basically agreeing.  But it just seems like those are the two things, and what the Court was talking about, those sort of concisely -- those are the two

24-cr-00082-RMR     Jury Trial, Vol.IV    July 17,
2025

aspects of it.  Didn't possess the stuff on the 18th and not a
member of this conspiracy.

THE COURT:  Yes.

MR. GAINOR:  Now, I'm not sure I understand.

THE COURT:  What I do understand is that what we're
trying to do here is to condense these two different
instructions that you have submitted into one instruction that
reflect your theory of the case.  So the first part I'm
adopting what you have submitted.

MR. GAINOR:  The first part being the first paragraph?
I'm not sure based on --

THE COURT:  Don't you have the instruction --

MR. GAINOR:  I do, but --

THE COURT:  -- and the paragraphs that my clerk gave
to you?

MR. GAINOR:  I do.  I'm looking at them.  It looks to
have different paragraphs, so I'm just trying to --

THE COURT:  It does have different paragraphs.  So the
first paragraph would read, "Mr. Meek makes the argument that
Count 7 of the superseding indictment alleges a conspiracy
between him and Ms. Foster relating to the distribution of the
specific controlled substances charged in Counts 1 through 4 of
the indictment, such that the indictment alleges that the
object of the conspiracy is to distribute drugs as stated in
the superseding indictment.

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

"You are instructed to interpret the indictment based on the plain language of the indictment considering how an objective reader would understand it.

"The government has the burden to prove beyond a reasonable doubt the single conspiracy as alleged in the indictment."

Then it would go to your second page and the paragraph that I have adopted are paragraph 2 of your Theory of Defense, Instruction Number 2, which reads, "Mr. Meek has argued that the controlled substances subject of Counts 1 through 4 were not his and that he was not a member of a conspiracy to distribute them."

I have omitted your proposed paragraphs 3 and 4 of the Theory of Defense as redundant or unnecessary under the circumstances.

I have adopted paragraph 5 and 6 precisely as you have tendered them, except to the extent that indictment is referred to as opposed to superseding indictment.  Thus it would read, "If you find that Mr. Meek was not a member of the conspiracy charged, then you must find Mr. Meek not guilty, even though Mr. Meek may have been a member of some other conspiracy.  This is because proof that Mr. Meek is a member of some other conspiracy is not enough to convict.  But proof that Mr. Meek was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government proved

651

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

beyond a reasonable doubt that he was also a member of the conspiracy charged in the superseding indictment."

MR. GAINOR:  It's okay by the defense.

THE COURT:  And Mr. Winstead has already blessed it. So Ms. Keast-Nachtrab, would you please put this in final.  It will amend our order.

Ms. Myhaver, would you please just let the jury know, we apologize for the delay, we are finalizing the instructions and we will expect to complete this portion shortly.

THE DEPUTY CLERK:  I will, your Honor.

THE COURT:  We'll be in recess.

(Recess)

THE COURT:  I think we have all the finals. Ms. Keast-Nachtrab is going to give you your copies, but I understand you have all looked at these and everybody was looking over her shoulder.

Are we ready to bring in the jury?

MR. GAINOR:  Yes, your Honor.

THE COURT:  So Mr. Gainor, I will give you the opportunity to make your statement about your case.

MR. GAINOR:  Resting.

THE COURT:  Resting.

And then we will read the jury instructions.

MR. GAINOR:  Okay.

THE COURT:  And then we will move right into closings.

24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

MR. GAINOR:  I'll wait until the Court calls me, obviously.

THE COURT:  All right.  Let's bring in the jury.

Do the parties have an objection to not transcribing the jury instructions?

MR. GAINOR:  I have no objection -- well, I mean, were there any -- I guess there were some objections on the issue of the investigation.  That's --

THE COURT:  Those were all on the record.  These are just reading the final version of the jury instructions.

MR. GAINOR:  That's fine.

MR. MCINTYRE:  No objection from the government.

MR. GAINOR:  No objection from the defense, your Honor.

THE COURT:  Thank you.

(Continued on next page)

(In open court; jury present)

THE COURT:  We are back on the record in 24-CR-00082, United States v. Meek.  The record will reflect that all members of the jury are present.

Welcome back, ladies and gentlemen, and thank you for your patience this afternoon.  We are going to move forward with Day 4 of the jury trial.

At this point, Mr. Gainor.

MR. GAINOR:  Yes, your Honor, thank you.

Your Honor, at this time, the defense would rest.

THE COURT:  Thank you.

Ladies and gentlemen of the jury, what that means is that the presentation of evidence in this case has now been completed.  At this stage, what we will do is we will move into the jury instruction phase.  You heard a lot of discussion in the voir dire in this case about the instructions that the Court would give and that you are sworn to follow those instructions.  Well, I am now about to read to you the instructions that you will be asked to follow and you will be duty bound to follow.

After that, there will be closing arguments by each side, all right.  Now, I am going to read the jury instructions to you.  Ms. Myhaver will also put them up on that ELMO you have come to learn about there, and they will be up on your screen.  You don't need to take notes as the instructions will

654
24-cr-00082-RMR    Jury Trial, Vol.IV    July 17, 2025

also be sent back to the jury room with you as well, but you are free to take notes as you would like to.

With that, I will begin reading the instructions.

(Jury instructions read).

THE COURT:  Instruction Number 46, we'll get to that after the closing arguments.

So ladies and gentlemen, at this time, we will have the closing arguments by the parties.  I will remind you that the statements by the lawyers are not evidence.  They are intended to help provide you, again, with a roadmap as to what each party believes has been proven in this case.

I forgot to do one thing.  I need to also -- Ms. Myhaver -- go through the verdict form with you.  We'll do that.  These are the forms that you will have -- or the form you will have to complete.  This will be signed by the foreperson and then by each of you as jurors.

(Verdict form read).

THE COURT:  You will date this and put the signature of the foreperson here and there's a line for each of the jurors to sign.

Now, having completed that part, we will hear closing arguments by each side, and we will begin with the government.

Mr. McIntyre.

MR. MCINTYRE:  Thank you, your Honor.

THE COURT:  All right.

MR. MCINTYRE:  I have to plug in and get my computer set up, if I may have just a moment.

THE COURT:  You may proceed.

THE DEPUTY CLERK:  Would you like a warning, and would you like to reserve any time for rebuttal?

MR. MCINTYRE:  Can you give me a warning at 12 minutes into my first closing.

With the permission of the Court.

This case is United States of America versus Nathan James Meek.  No matter what you hear during the closing argument, keep in mind this man is the man on trial.  You are going to hear a lot about other people.  What you hear about them and what you consider about them is only relevant to the extent it bears on whether or not we have proven this man is guilty of the charges against him.

He's charged in seven counts.  Four counts of possession with intent to distribute the different drugs we have talked about for several days, possession of a firearm as a prior felon, which they told us in opening they're going to concede -- we will see if that follows through -- possession of a firearm in furtherance of drug trafficking, and conspiracy to distribute the drugs found in Count 7 of the superseding indictment.

Let's talk about the drug counts first.

I also want you to keep in mind, the date alleged in

Mr. McIntyre - Summation

the indictment is on or about January 18th of 2024.  That means reasonably near.  So on or about January 18th doesn't mean January 18th.  There's flexibility to how you consider it.

Let's start by walking through the late part of this case, January 17th and 18th of 2024.  Tex Johnson and Mr. Meek are texting and Mr. Meek says, I got, got drugs, but my whip down.  He has drugs, but he's not mobile.  So Tex has to go where Mr. Meek wants him to go.

Later, he texts with Rhonda.  Rhonda agrees to meet up at his apartment.  This is on the 18th in the early morning hours, just after midnight.

"Want to meet at the apartments?"

"Yeah."

And by 12:42, Rhonda and Anthony are at the apartment. You know that because she told you and you also know from the text messages and from the video shot that she very shortly after sent to Detective Arvizu.  While she is there, she explains how she buys blue.  She buys fentanyl, which Anthony is a user of.  She sees Meek in possession of a black backpack full of drugs.

Low and behold, when they do a search, there's a black backpack full of drugs.  There is no way she would know that exists unless she saw it.  She's not a defendant in this case. She doesn't have the discovery.  There's no reasonable way she could have guessed anything that specific.  She told you that's

657

Mr. McIntyre - Summation

what she saw and that's exactly what they found in the apartment.  That was full of methamphetamine, cocaine, Ecstasy and baggies, and then other paraphernalia as well.

Then while she's there for this half-hour period, in conversation with him, in close proximity to him, she shoots a video surreptitiously, which you have seen.  This is during the actual drug deal she shoots this.  She's there to buy fentanyl, and she does, in fact, buy fentanyl from this man, Mr. Meek.

I encourage you to watch that video as many times as you need to, but it's clear, when you look at the photos, he has a gun on his hip.  And it's clear from the two-second video.  It was clear to Rhonda who was there for 30 minutes. It was so clear that she sent the text message to Detective Arvizu highlighting it as a gun.

When we look at the apartment, we know it's the same apartment because, on the left, we have the photograph from the search and on the right we have the still shot from the video. You can see the speaker.  You can see the green tea, things like that.  It lines up perfectly so we know it's the same apartment.  Same thing here, you see the potholders. Everything lines up.  We know we're in the same apartment that's eventually searched.

Detectives later find the gun in the drawer right next to the methamphetamine, the largest bundle of methamphetamine, about 1600 grams of fentanyl, marijuana, giant bag of marijuana

Mr. McIntyre - Summation

and the morphine pills.  In this drawer that's circled in yellow, the find the gun, in the photograph on the right, along with two boxes of ammunition.

Look at that gun.  Watch the video as many times as you need.  You see this button.  If you look closely you can see this white writing, you can see that here and here.

We have other photographs in discovery that shows it's a paddle holster, which is exactly like he's wearing it here.  The details of this gun are visible in the video.  The size fits.  There's simply nothing else he would be wearing during his drug deal selling fentanyl to Rhonda and Anthony.

Going to the next day, that was just after midnight, Tex Johnson has more text messages between 10:00 a.m. and 1:00 p.m. on the 18th.  He buys more drugs.  He asks where to head to.  Mountain Ridge Apartments.  Where do you think Mr. Meek slept that night?  At midnight, he was with Ms. Foster, His car was broken, he wasn't mobile.  And by 10 a.m., he's selling drugs.  It's pretty clear he stayed the night at that apartment with those drugs the entire night.

And these are the later text messages where Tex Johnson asks for drugs in the morning and he asks for more drugs in the early afternoon.

Then you have Rome, Detective Arvizu.  After he receives the video and confirms that this man, Nathan Meek, is at the Mountain Ridge Apartments, they come up with this ruse.

They learn that he buys cigarettes, probably stolen cigarettes. And to make a deal, he is going to go to the apartments and draw him out and arrest him.

During that first call, Exhibit 307, the defendant is in the apartment with those drugs, with all four guns, including the loaded gun on his hip in the video and the Ruger that we later see recovered from the back of his car parked at the apartment. He's there with everything. What does he say? He says, I have everything to trade. He wants to emphasize it, I have everything to trade, if you want to trade instead of cash.

Do we have sound on this? Can we please? It's my computer that doesn't have sound or?

THE DEPUTY CLERK: It will play.

MR. MCINTYRE: Maybe it's my error. Can I have one moment, your Honor?

(Media played)

MR. MCINTYRE: What is he referring to, cash or trade? What do we know is in that apartment? What would it be other than the drugs in the context of this deal? What is he going to trade? He is going to trade methamphetamine, cocaine, all the other drugs that were recovered because that's what he does. He's a drug dealer.

You watched a drone video. Can you see from both angles the defendant makes this motion. When we find the gun

Mr. McIntyre - Summation

there, we know what he's doing.  When he realized the police were there, he gave up, dropped his phone, which was full of evidence of drug dealing, dropped the gun, and he went out and he was arrested.  But he didn't have that the much time.  So when he was finally searched, what did he have on him?  $3,000, $3,020 and a wad of cash wrapped around a little baggy with the word "Best" in blue letters full of fentanyl.  That was inside the cash, if you remember the testimony.  He also had this little baggy of Ecstasy.  On the right we see where his phone was recovered relative to that Ruger.

So they get a search warrant.  And what do they find when they go inside?  They find what Mr. Meek meant when he said he had everything to trade.  He said it twice.  "I have everything to trade, if you want to trade."  They found hundred packs of fentanyl, over a thousand pills, a hundred grams of fentanyl.  They found a large bag full of small bags with in capital letters "Best" in blue writing in the bag with the four pounds of methamphetamine.  The hundred grams of fentanyl, and they found the morphine pills.

In the bag next to it, they found a large bag of marijuana, also known as green, as we know from text messages.  We have the best baggies in three locations:  In his pocket, in the bag with four pounds of methamphetamine and hundred grams of fentanyl, and we don't have a photograph of it, but we also have it in the Adidas bag we're going to talk about.  This

Mr. McIntyre - Summation

black zippered case, a "Best" baggy, a scale with residue, and this is the container that the other methamphetamine and quantity of cocaine and Ecstasy were found in.  That's quite a coincidence for someone who didn't possess those drugs to have one of these in his pocket and other collections with the other drugs in the bedroom where he slept last night.  Any suggestion he didn't possess those drug absurd.  No matter what you hear, I want you to keep in mind there's simply no other explanation for these coincidences, for these connections.  The only possible conclusion from this is Mr. Meek, who was the only person in the apartment at the time he was arrested, the only person we know was there earlier -- we know Ms. Foster came and went, but the only person who was there consistently from the 17th and the weeks before, as we know from his text messages, we know he's dealing in these quantities of drugs, these specific drugs, and there's simply no other explanation.

This is the Adidas backpack and black zipper case. Another pound of meth, 71 grams of cocaine and a quantity of Ecstasy, in addition to the "Best" baggy and other small baggies meant for breaking down those amounts and selling them to other people.

He has a thing for skeleton masks.  Much was made of the fact that these were children's skeleton masks.  What a coincidence.  In four places associated with him where he deals drugs he has skeleton masks.  There's one on the left from 2018

Mr. McIntyre - Summation

where he admitted distributing methamphetamine, right next to the meth, the gun, the scale and the bullet proof vests.  And the three on the right from this case.  One on the upper right-hand corner he was wearing on his face when he was arrested.  The other two contains the drugs.  The other one contains the cigarettes he buys.  These may or may not have been children's masks.  He clearly has a thing for them and they clearly tie things together.

We have the black duffel bag and the Wal-Mart bag. That Wal-Mart bag has his mail, his name on it.  The black duffel bag has -- had the marijuana -- the second bag of marijuana, has the phone number, the piece of paper with the phone number on it, and it has Suboxone.  It has additional drugs.  And also a single round of Blazer brand ammunition. You'll have the ammunition.  I think the testimony wasn't super clear on that.  You can look for yourself.

The rounds in the Walther found in the drawer, those are Blazer rounds.  The single round in the Adidas bag is a Blazer round.  And the round in here is Blazer brand ammunition.

Why is that significant?

What did Detective Genta tell you about how to make a gun safe?

If the magazine is in the well, a bullet in the chamber, you take out the magazine, and you take out the

Mr. McIntyre - Summation

bullet.  When you are loading and unloading your gun, while dealing drugs, you have a single bullet to throw in your bag, the Adidas bag with the cocaine, methamphetamine and Ecstasy, or the black duffel back with the green or the marijuana.

Let's take a look at this.  I don't think Mr. Gainor is going to talk much about it when he gets up here in the next couple minutes.

MR. GAINOR:  Objection, your Honor, reserve motion.

MR. MCINTYRE:  Here we have a sheet of paper with a phone number.  I think the detective thought it was Juan.  When we go in his phone, we know it's Ivan.  You can see that's the number programmed in the phone.  You know that's a person he participates in drug dealing with.

Then we have a shotgun in the closet.  The only ammunition that fits that shotgun was found in the green duffel bag inside a Crown Royal bag.  We know that was his because it was sitting underneath the black bag.  The Crown Royal bag, we found one of those in pretty much each of the bags recovered. I think there was four total.  It has the rounds that fit in the heater in the closet.  You can examine the actual bullets because those have been admitted into evidence.  The additional ammunition has been recovered.  This is 9-millimeter, this is 9-millimeter, this is Walther, and this is 12 gauge.

So after his arrest, Ms. Foster finally gets ahold of him in jail.  He asks about a second phone because he wants to

obtain phone number of his drug customers, drug suppliers.  And he learns for the first time that they went in the apartment.

(Media played)

MR. MCINTYRE:  That's all bad because he knows what they found when they went inside there.  And I want to make one comment about the statement I made earlier with reference to Mr. Gainor.  He has no burden to do anything.  He doesn't have to get up here.  It's all our burden.  He doesn't have to do anything.  We have to meet our burden.  If we don't meet it, you are required by your oath to find Mr. Meek not guilty. Make sure you focus on that instruction that the burden is entirely on the prosecution.

These are some of the factors to consider.  You can run through these when you read the instruction.  Other than Number 4 that the firearm was stolen, there's no evidence of that.  When you consider those factors in conjunction with common sense and other stuff you come up with, it's clear it's to protect his drugs, to protect his profits, to intimidate his customers, to prevent them from trying to rob him.  The defendant is guilty of the felon in possession and the -- possession of a firearm in furtherance of drug trafficking.

When you go through the phone, the text messages, you can see that they match the physical evidence perfectly.  He talks about methamphetamine, marijuana, fentanyl, cocaine. Someone asked him if he has heroin, he says no.  What do they

Mr. McIntyre - Summation

not find?  They don't find heroin.  He talks about morphine; they find morphine.  He talks about locations; all those locations are right near the Mountain Ridge.  Everything lines up perfectly to demonstrate the defendant is guilty as charged.

For the conspiracy counts, he admits that he has part-time employees.  He calls Renee a trusted employee.  I encourage you to go through her text messages carefully.  When he scolds her for how she handles his money, when he tells her to pick stuff up, to deliver stuff.  You heard a lot more context during trial, you saw from her testimony, but as it relates to the charge and the conspiracy to distribute drugs, you can get there on the text messages alone.

She's clearly a gofer for him.  She's clearly running his errands.  In other conversations, she's picking up drugs, delivering drugs, picking up money.  She's keeping a ledger. You see this conversation with Brenda where they go through prices.  655, immediately texts that to Renee Foster.  They're keeping track of accounts owed and -- to further the drug trafficking.

When you look through the other conversations, you're going to see meth conversations, including the code words you learned about from Detective Jeffers, from Rhonda Cruz and from Renee Foster.  You are going to know what those terms mean from those three witnesses.  We talked about fentanyl, talked about cocaine or white, talked about green, talked about locations,

666

Mr. Gainor - Summation

talked about the interactions between Renee and Mr. Meek to demonstrate the conspiracy, but there's also other people. There's distributors to Mr. Meek. Ed there's subdealers for Mr. Meek. When you look at all those together, you'll see that there was indeed a conspiracy between Mr. Meek, Ms. Foster and other persons referenced in the case.

And at the end of the case, when you review all the evidence and the instruction, we ask you to find a verdict of guilty on all counts and a special verdict relating to the highest amount listed on the verdict form.

Thank you very much.

THE COURT: Thank you, Mr. McIntyre.

Mr. Gainor, we'll be pleased to hear your closing statement.

MR. GAINOR: May it please this Honorable Court.

When you walk into a courtroom, ladies and gentlemen, the instant you cross the threshold, you immediately realize it's unlike any building, any room in any building anywhere.

Why is that?

Why is a courtroom so special, so different, so unique?

Well, at first, when you walk in, you see the high ceilings, you see the wood paneling, perhaps even the flag in the back of the courtroom, in the front of the courtroom. But it's none of that really. A courtroom is special for one

Mr. Gainor - Summation

reason and one reason only.  That person sitting at the head of the courtroom, every courtroom has a judge.  So people who walk through its doors know, whether they are young or old, rich or poor, white or black, that this is the one room in a building, any building where they can get justice.

Now, notice how Judge Rodriguez sits above us all on an elevated bench.  It doesn't mean that the Court is better than us.  It just means that the law has to be above those concerns that interfere with true justice.  Sympathy, anger, prejudice, all those things that have no place in a courtroom.  A judge and the law have to operate without that, sometimes doing things that they don't necessarily want to do.  But they have to follow the law, whether they like it or not.  You don't find another room like that.

Well, a strange thing happened.  It seems like a lot longer than a week ago or five days ago, all of you took an oath and you became judges too.  You heard that in the instructions, you are judges of the facts.  Now, you don't have the robe, you don't have an elevated bench, but what you do have is the single-most important role in this case, to decide the facts using the law, whether you like it or not.

Now, you are going to hear about some law that may be complicated.  You are going to hear some law, and you have already heard it, that you may not agree with.  But it's the law that you are sworn to follow.

Mr. Gainor - Summation

Now, in a criminal case, one of the most important -- although all of the law is important -- is the divining standard of how to judge someone in Nathan's position against the backdrop of the charges, and that's the law of reasonable doubt. It was just read to you. You have heard it several times, I think perhaps even at the beginning of the case. But the law of reasonable doubt is an exacting standard, it's a high burden, the highest burden in our system of law.

The government, Mr. McIntyre and his team, Mr. Winstead, have the burden of proving Nathan Meek guilty beyond a reasonable doubt. And if they fail to do so, you must find him not guilty. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt and a reasonable doubt is based on reason after careful and impartial consideration.

If you find that there is a real possibility, a real possibility that the case is not proven, that the facts at hand don't establish guilt, then you must, whether you like it or not, give the defendant the burden -- excuse me -- the benefit of the doubt.

Now, as judges, you have the indictment as your roadmap. You have Counts 1 through 7. And to reiterate what we have talked about before, Counts 1 through 4 deal with a specific controlled substance, fentanyl, methamphetamine, cocaine and marijuana. Count 5 is the weapons possession by a

Mr. Gainor - Summation

convicted felon, Count 1Six is the use of a weapon in furtherance of a drug trafficking crimes.  And Count 7 is the conspiracy.  Of course, we'll be talking about all of them.  But for purposes of your job and for purposes of consistency, on that verdict form, check the box guilty on Count 5.  That's what we told you in opening.  He did possess a weapon on that day.  It was on the bumper of the car.  He was guilty of it.  He has to be punished for it.

Now, here is the rest of the case, here is where the tough part begins.

You'll need to consider this as judges, albeit without the robes.  Impartial, scientific, objective, cold and calculating, without emotion.  All of you said you could do it, and your Honors, we're going to hold you to it.

You have to ask yourself this question or these questions:  Is the proof reliable?

Are you firmly convinced within the wording of the reasonable doubt statute?

Or is there a real possibility that Nathan Meek is not guilty?

And we'll focus on Counts 1, 2 and 3 and 4 first.

What is the evidence that Nathan Meek possessed the four categories of drugs found in Apartment 333 on January 18th, 2024?

Well, it is interesting, from Mr. McIntyre's

Mr. Gainor - Summation

presentation, that he didn't talk about Renee's testimony in court whatsoever.  His lead witness, his star witness, just ignored it and focused on the texts.  Now, we're going to talk about the texts, but with regard to Renee Foster, ask yourself, is she the type of person, the type of evidence that is reliable?  Does it firmly convince you of someone's guilt?  Or is there a possibility, a possibility that maybe what she said, what she told three different people before she ever got charged with a crime, that Nathan Meek did not own the drugs in the apartment, that there was a man by the name of Anthony Quintana, and we know that's not a phantom, because we know that she swore out an affidavit against Mr. Quintana for what, domestic violence.

When?

Two months before January 18th, 2024.  Two months. She was afraid of Anthony Quintana.  These were Anthony Quintana's drugs.  She was in fear of Anthony Quintana. Anthony Quintana -- and she answered honestly -- that was tough testimony to go through -- beat her up, punched her on her face 20 times or more.  I believe the testimony was all this occurred during a three-year period when Anthony Quintana was living at Apartment 333.  The timing of the Anthony Quintana disclosure was unrebutted.  And it wasn't just said once, it was said twice to two different investigators for the federal public defender's office.

Mr. Gainor - Summation

Reasonable doubt can arise from the evidence, the conflict in the evidence or the lack of evidence.  We can use our common sense to figure that out, your Honors.  There is the star witness of the government, who says before she's charged that Nathan Meek was not the possessor, owner of the drugs in that apartment.  That's what this case is about.  Counts 1, 2, 3 and 4 deal with the drugs in that apartment, Ms. Foster's apartment.

Is there a real possibility that she spoke the truth?

Remember, I don't have the burden.  Just the conflict in evidence is enough.

And notice how her testimony changes only after she talks on the phone with Nathan Meek, only after she expresses her love and her intent to help, and only after she gives statements to his private investigators that were disclosed to the government.  What happens then?

Well, the FBI and the United States Department of Justice say, well, we need her, so we are going to charge her with a crime.  And she goes from no time, no charges, to a crime that could land her in Count 7 to life in prison.

What is that going to do to someone who is not compromised, not vulnerable, not abusing drugs, not going through hell?  Just imagine that.

She is advised to come in and cut a deal by her lawyer.  Her lawyer tells her to talk about domestic violence.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Mr. Gainor - Summation

You heard that testimony.  I'm advised by my lawyer to talk about it.

Well, she gives the government what they want, at least initially, by making an about face, by changing her tune and by saying now, well, the drugs don't belong to Anthony Quintana, they belong to Nathan Meek.

Think about the incentive.  Think about the pressure. Think about what she was subjected to looking at life on Count 7.  What would that do to anyone?

Well, you saw what it did to her on the stand.  I guess that's why Mr. McIntyre didn't want to talk about it.

Is this the type of quality proof that you can rely upon to alter a man's life for the rest of his life?

Your Honors, sometimes evaluating the law and sitting as judges is not an easy thing.  We'll make Count 5 easy for you, but not these other counts.

The proof came in the form of statements of Renee -- excuse me, Ms. Foster on two occasions.  And there was support for it, because we know Quintana exists.  She was specific. And the motive for changing that testimony is clear and common sense.

How could this case have been decided to make it easy for all parties?

Well, there were many items in this case.  This is just one slide.  Slide Number 2.  Slide Number 3, 4.  Let's go

to Slide 1.  We're going to show you --

THE COURT:  Hold on a minute.  We're not seeing it, the whole first row.  We'll pause your time, Counsel.

MR. GAINOR:  Yes, your Honor.

THE COURT:  Everybody sees it.

You may proceed, Mr. Gainor.

MR. GAINOR:  Thank you, your Honor, for the solution.

I'm not sure what slide we're on.

One, 2, 3 items in an apartment, weapons in drawers, ammunition in drawers or bags, clothing, hundreds of items, maybe more if you breakdown the ammunition.

We live in 2025.  This is the federal government.  Not one of these items was processed for fingerprints.  Not one of these items was processed for DNA.  Not one hair sample was taken.

From the very beginning, since the FBI and DOJ were listening to phone calls, they knew that there was an issue with identity of who owned what in Apartment 333.  All they had to do is process one item, process to find some DNA.

Is it stretch of the imagination that there would be no DNA and no fingerprints and no hair samples that would point to Nathan Meek, or is it that this concept, this understanding that was well known to the government, that Anthony Quintana, just two months before, who was living in that apartment, who, according to Ms. Foster, was the owner of the drugs, was it

Mr. Gainor - Summation

that perhaps that type of information might point to Mr. Quintana?

You are going to hear an instruction that the government doesn't have to avail themselves of every technique. But if you don't think the evidence is sufficient, if you think those techniques should have been done, you as judges, your Honors can find that to be reasonable doubt as well.

And let me give you another reason to think that you should be thinking that way.

If we can go to the next day, Ms. Dimercurio. And it might just be, I'm not sure who -- does everyone have it up?

Let's blow up that portion we talked about during Genta. Gas chromatography, mass -- I can't even pronounce these testing results, infrared spectrology, Marquis color test. For one substance of drugs that was found in the apartment, the United States Attorney's Office and their team did four different tests to confirm that it was drugs. Four different tests. And you'll see when you take the evidence back with you that they did that in almost every case. Four tests to confirm.

Why?

Because to convince you, they have to show beyond a reasonable doubt every element of every offense and one was that it was a controlled substance. You'll see that in the instructions that you heard. Instead of focusing on what they

Mr. Gainor - Summation

could have done to prove that Nathan Meek would either own the drugs or not, or that Anthony Quintana, who Ms. Foster told you was the owner of the drugs before she was leveraged and threatened with a life sentence, they decided to not process one item.

Is this the type of quality proof, selective discussion of evidence, before you can find a man and change his life for the rest of his life?

We're not living in 1976. This is 2025, when all of these investigative techniques were available. Process one bullet, you're going to find a fingerprint. When they move the box of bullets into a blue plastic containing, there's going to be something there. Why does Genta wear gloves? So she doesn't interfere with fingerprints or DNA.

Why wasn't it done on one of the thousand items?

And even Renee Foster was hesitant to give the government everything they want. I told you -- or she told you my lawyer told me to talk about domestic violence. But isn't it interesting that it was domestic violence that was committed against her by Anthony Quintana multiple times just months before?

I told you, says Ms. Foster, that when I said heater in a closet, I meant a space heater. They were trying to abstract from her what they wanted to try to make a case without using physical, scientific accepted techniques to do

676

Mr. Gainor - Summation

so.  One item, one test.

If Nathan Meek was handling these drugs, his fingerprints would be on them.  All those baggies, just process one of them, process two of them, process three of them.  Why?  Because they expect you to speculate that someone is guilty?  No, it doesn't work that way.

Well, what about the text messages?  The text messages talk about something, they do.  You're going to get the chance to review, again, this Theory of Defense instruction that has been put before you.  Mr. Meek has argued through his counsel that the controlled substances subject to Counts 1 through 4 were not his and that he was not a member of conspiracy to distribute them.  If you find, your Honors -- this is not be arguing, this is the law that you have to follow.  If you find that Mr. Meek was not a member of a -- of the conspiracy charged, then you must find Mr. Meek not guilty even though Mr. Meek may have been a member of some other dealing, some other conspiracy.  This is because proof that Mr. Meek was a member of some other conspiracy is not enough to convict, just like the 2018 case is not enough to convict him.

And that case is helpful because what happened in that case?  He was found and admitted to, just like he admitted to Count 5, that there were 43 grams in his car; right?  Remember that?

And Ms. Foster said, Mr. Meek, when he had drugs,

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

Mr. Gainor - Summation

would have them in his car or on his body.  Nothing about storing them in the house.  And that would still be a problem, if we didn't -- it would still be a problem, but when you have Quintana as the person who Foster has said repeatedly was the owner of drugs on a timeframe that was so close in relationship to the arrest, there is a plausible, reasonable explanation.

If you think that that testimony is plausible or possible, there's only one verdict on Counts 1, 2, 3 and 4. That's not guilty.  And this is whether you like it or not. You might say, you know what, they were in the house.  But if you believe that there was a possibility that they were Quintana's drugs, based on what we believe was an honest Renee Foster before she got leveraged with life in prison, then it's not guilty on Counts 1 through 4.

And even if you think that Mr. Meek was engaging in narcotics trafficking or narcotics dealing on something else -- even Foster said, he did some things that I didn't even know about, but he always kept his drugs in the car or on his body -- then that's a separate conspiracy.  And whether you think it's confusing, complicated or you don't like it, it's the law and you can't ignore it.  That is Instruction 28. Please focus on it.  We cannot selectively ignore laws.  We have to follow them.

And that law is written for a reason.  The government has got to prove the conspiracy charged.  They are alleging

Mr. Gainor - Summation

that the drugs in that apartment, 333, Counts 1, 2, 3 and 4, specific amounts were Nathan Meek's.  I suggest that -- I suggest there's more than a reasonable doubt on multiple levels from Renee Foster.

Let's talk about Ms. Cruz.  Ms. Cruz used drugs thousands of times, according to her testimony.  You have read -- you heard an instruction about having to consider with great weight the use of a drug user, the testimony of a drug user.  She was so unreliable in her testimony.  And you have to judge each witness according to the law and you have a whole laundry list of what you need to follow.

Ms. Cruz got terminated as an informant because she picked up new charges, which endangered the public.  You all, us all, and law enforcement.  She lied to law enforcement.  You heard from Arvizu, who told you that he got reliable intelligence that she was dealing in narcotics, not just in violation of a contract, but in violation of an understanding and a rapport and a relationship that she had, professional relationship with Arvizu.  And she lied on the stand and said that she was not dealing in drugs.  She's a drug addict, a liar and a thief.

And I ask you, your Honors, is this the type of reliable proof that you would hang your hat on unanimously that Nathan Meek is guilty of possessing Counts 1, 2, 3 and 4, the drugs contained there?

Mr. Gainor - Summation

And when you look at Count 6, which is the weapons possession in furtherance of trafficking, take a look at that instruction carefully, because that instruction says "This count is in connection with Counts 1, 2, 3 and 4."

So if you find Nathan Meek or believe that there is reasonable doubt with regard to his involvement in Counts 1 through 4 --

MR. MCINTYRE:  Objection, misstatement of the law.

THE COURT:  The jury will be instructed to review the law and accept your view as you interpret it.  This is the defendant's argument.

MR. GAINOR:  You use your common sense.

THE DEPUTY CLERK:  You have six minutes remaining.

MR. GAINOR:  When you look at that law, it is predicated on involvement and connection to Counts 1, 2, 3 and 4.

MR. MCINTYRE:  Objection, misstating the law, misstating the charges.

THE COURT:  Again, the jury, you are instructed and you will have the instructions that you will review yourselves. The defendant is entitled to make his argument.

MR. GAINOR:  Thank you, your Honor.

With regard to Ms. Foster, they are focusing their case on Foster and Cruz without any emphasis, without any responsibility to look at the physical evidence.  They denied

Mr. Gainor - Summation

the physical evidence.  They looked at this case through a lens with blinders on.

What do they have in this case?  They have two letters -- if we can have those up briefly -- with Nathan Meek that were found in a laundry bin with his laundry that show a different address, that show that he had his own home -- excuse me, apartment to live in.

There's a picture of Nate on a roof where he was working in 2023 helping to build houses.  You heard from Renee Foster in a clear moment that she would go to Home Depot, get weatherstripping to help for the job.  She talked about numerous jobs.  There was no wage reports that show he earned any money.  There was a conversation with regard to cigarettes.

Let the indictment be your guide.  The conspiracy in this case, if there was a conspiracy, is not focused on Counts 1, 2, 3 and 4.  Those were Quintana's drugs.  We don't have to prove that, but we have shown multiple examples that that was the case.  If you are not firmly convinced that Nathan Meek owned those drugs, then he's not guilty.  Just ask for one fingerprint, one piece of DNA, one hair sample, one connection to the drugs.  Multiple guns, multiple baggies, multiple guns, nothing with Nathan Meek's fingerprints, nothing with his DNA.

Foster and Cruz, that's what this case is about.  I suggest, now, that probably Mr. McIntyre will talk about them instead of ignoring them again.

Mr. Gainor - Summation

Is it possible Quintana was the owner?

Is it possible?  If you say yes, it's possible, that's not guilty on Counts 1 through 4.  There's no choice.

Is possible, is it reasonable that the police could have done more?

And is that enough, the proof that's been before you to convict a man and change his life forever?

If Nate was the owner of all the drugs, weapons and ammunition in Apartment 333, there would be scientific evidence to prove it.  Why are they hiding from it?

Why, after listening to the phone calls, knowing Renee Foster's intent to help Nathan Meek and testify for him, why would they not get one fingerprint off of a baggy, off some drugs, off a gun, off a container?

Why?

Is this the type of quality proof that we can rely on before we convict a man?

I also urge you to consider the timing of the Quintana disclosure.  Two months before Nathan Meek went to that apartment in January of 2024, two months before.  And the effect of charging someone who was not charged with a felony that would have landed her in prison for life.  All of these create reasonable doubt.

And I ask you, your Honors, is this the kind of reliable proof that firmly convinces you of Nathan's guilt,

Mr. Gainor - Summation

using the words of the jury instruction that we cannot ignore?

When you look at this case objectively, scientifically, looking at the lack of evidence, the conflict in evidence with Foster and the evidence generally, what type of conclusion are you left with?

We suggest that when you do, the only count that you can convict him on is Count 5.  Because he should be convicted of Count 5, he had a gun that day.  But there's no other linkage to him. There's no other linkage to the other guns. There's no proof.

The pictures you looked at also show an altered scene. Closet doors are open, closet doors are closed.  We don't know what was happening.  We know they didn't want to take one fingerprint, one swab of DNA, or do anything to prove this case They want you to guess him guilty, and that's not the way to it.  We suggest when you look at the evidence through that lens, there's one verdict:  Guilty of Count 5.  But not guilty of Count 1, Count 2, Count 3, 4, 6 and 7.

Following this Theory of Defense instruction, please take a look at this carefully.  Take your time.  Go through all the exhibits.  Ask yourself, why don't we have scientific physical evidence in 2025?

And when you do, we hope you'll agree that Nathan Meek is only guilty of one charge, Count 5, and not guilty of all the others.

Ladies and gentlemen, thank you for your time and patience with me.

THE COURT:  Thank you, Mr. Gainor.

Mr. McIntyre, pleased to hear the remainder of your statement.

MR. MCINTYRE:  Your Honor, how much time do I have remaining?

THE DEPUTY CLERK:  You have 12 minutes remaining.

MR. MCINTYRE:  Well, if you liked that one, you are going to like the one about the Easter bunny.  My recollection -- you rely on your recollection, but my recollection is the testimony was the domestic violence happened in July and he was in custody from July.  But let's give Mr. Gainor's memory the benefit of the doubt and let's say it was two months before.  A couple of things to note about that.

Renee Foster never said it was his drugs.  He said that three times, that Renee Foster said that.  She talked about him being in the apartment at some point before Nathan Meek came back in her life.  She never talked about domestic violence.  She never said he was a drug dealer.  She never said those were his drugs.

Let's assume that way, let's assume that fact in the defense's favor.  Is it plausible that two months later four pounds of meth could still be on a dresser in the apartment of

Mr. McIntyre - Rebuttal

a meth addict and a meth dealer, that they wouldn't have touched it?  Don't they need the space on the dresser?  Is there any way that stuff would still be there after two months?

It is absurd.  That is a desperate reach.  That makes absolutely no sense.

What was the defendant offering to trade Rome?  "I have everything to trade."  Was he talking about Anthony Quintana's drugs?  Was he talking about phantom drugs?  Was he talking about Pokeman cards?  What was he talking about?  We know what he was talking about.  What was Tex making multiple trips on the 17th and 18th to purchase?  Phantom drugs?

What did Rhonda buy?  Rhonda was a meth addict.  Tex was a fentanyl addict.  Why are they there after midnight?  What are they buying?  Phantom drugs?  Imaginary drugs?

Anthony Quintana.  She never said anything about Anthony Quintana and drugs.  She just talked about domestic violence.  This was months prior.  Months prior.

We know one drug dealer who keeps his stuff in Wal-Mart bags.  He probably did take it in his car with him if he was staying somewhere else.  He was taking -- everything associated with him in that room is portable; Wal-Mart bags, duffel bags, backpack, suitcase.  He was there because his car was broken.  He was staying there.  He would take it with him when he goes, but he wasn't going anywhere.  It was clearly his drugs.

Mr. McIntyre - Rebuttal

He's now admitting he possessed a Ruger that day, but he's also guilty of possession in furtherance of drug trafficking with that one.  Think about Rome.  This is Rhonda's homey.  What does he have on him when he goes down there?  He has cash.  He has a little baggy of 10 fentanyl pills with the "Best" branding on it.

What did Detective Jeffers tell you about how drug dealers recruit customers?  They will take cash.  I can take a trade.  That was a sample he was going to give Rome to hook him up as a customer, see if he liked the product.  That is distribution of a controlled substance.  You'll see the definition, you don't have to get paid for it, you just have to distribute it.  He went down there to meet Rome to distribute the drugs and buy the cigarettes.  He wanted a new customer. He had the gun in furtherance of that activity in case anything went wrong to protect his dope, protect his drug proceeds, $3,020 in his pocket.

What is the evidence he was working a legitimate job? Exhibit K.  Remember this took place in January.  Notice how green these trees are.  Mr. Meek is wearing a T-shirt.  Do you see any mountains over Colorado Springs?  We have no idea when this was taken.  Renee Foster said the earliest it was taken was the prior summer.  The defendant is not not guilty because he stood on a roof sometime months prior to this.  It is an absurd distraction that has nothing to do with the evidence in

Mr. McIntyre - Rebuttal

this case.

When we talk about conspiracy, the argument is there was some different conspiracies because Renee Foster didn't know anything about the conspiracy. Read that carefully because conspiracy law is complicated. I will tell you the law does not require proof that all of the members agreed on all of the details. The law required proof of the -- does not require proof the defendant knew all the members of the conspiracy or he knew all the details of how the activities were to be carried out. He personally belonged to the conspiracy for a brief period of time and played a minor role. That's why Renee Foster pled guilty. She played a minor role.

Mr. Meek, on the other hand, he led the conspiracy. He did know the details and he did conspire with Renee Foster and others to sell the drugs. He had multiple employees so he wouldn't have to do as much. That's what he told Tex.

When we talk about the domestic violence, we know from Ms. Foster's testimony. I don't know what you're going to make of that. We know that there was the Anthony Quintana domestic violence. But she also talked about the defendant's domestic violence. You saw her demeanor towards him.

And now you know from her plea agreement and the facts that she swore to under oath the control he had over her, the abuse, the fear. She talked about the intimate relationship back in 2019. This is before Anthony Quintana, because that

Mr. McIntyre - Rebuttal

relationship started in 2021, after Mr. Meek was out of her life for the first time.

She adopted a statement in her plea agreement -- this is Exhibit 301, so you can read it for yourself -- that he was physically and verbally abusive.  He caused bruising all over her body and he struck her in the face so hard one time he broke her jaw and a couple of her teeth.  On one occasion he was beating her so bad that her better option and the choice she took was to jump out of a moving car.

Fast forward to this conspiracy.  He reminded her of that.  Every time he said remember what I did to you last time, that is a threat to do that again.  That is a threat to bring up those emotions, the emotions that we saw on the stand. Obviously she's conflicted.

Is she someone who is motivated to make him look bad? Was it easy for her to say that he did those things?  You can judge for yourself.

The key is she never said anyone else possessed it. She never said Anthony Quintana did.  In the early statement, she did say it wasn't Mr. Meek.  But we know from the jail call, we know from all the evidence in this case, including his own words, he did indeed possess the drugs with the intent to distribute them.

And Mr. Gainor asked what proof do we have.  Because he wants fingerprints and hair samples.  Well, if you don't

need those to get to proof beyond a reasonable doubt, then you convict based on the evidence we presented.  We have the "Best" bag in his pocket with the other drugs.  We have him bringing people to the apartment the day of, the very day to sell the drugs.  He have him trying to recruit a new customer.  We have him as the only person in the apartment.  He is the only person in the apartment at the time he was arrested.

You think this man was living in that apartment with someone else's drugs sitting on dresser for months?  It's too absurd.  It's too absurd.

The best argument is that of Anthony Quintana, who has been in prison or jail since July of the previous year.  If that is the best argument, that is simply not a reasonable doubt.  That is an absurd fantasy that you should give no credence to.

When you consider all the circumstances, again, I ask you to return a verdict of guilty on all seven counts.  And with respect to the special verdicts, the highest amounts proveable.  Because 2,000 grams of pure meth is more than 50 grams.  2,000 grams of meth is more than 500 grams of a mixture of substance.  A hundred grams of fentanyl, over a thousand fentanyl pills is more than 40 grams.  And we have the cocaine and marijuana for sale.

I do want to focus on the possession in furtherance count, which is Count 6.  That is a possession count.  When he

has that in his hip ready or in his pocket ready to protect his drug proceeds, he doesn't have to use it, he doesn't have to brandish it -- we know he did brandish it with Rhonda, because we can see it with our own eyes in the video.  The fact that he possesses it nearby his drugs, his drug proceeds, the fact that, at midnight, he's in his own kitchen, and he feels the need to have a gun on his hip during a drug deal.  He can't deny it.  There's no other reason.  He's not out in the community.  There's no self-defense.  He is in his own kitchen after midnight, and he has a gun on his hip during a drug deal. That is possession in furtherance of drug trafficking.

I have already talked about the Ruger.  I won't talk about that.

He is clearly guilty on all those counts and we ask that you return that verdict.  Thank you.

THE COURT:  Thank you, Counsel.

So in a moment, Ms. Myhaver will escort you to the jury room and provide you with the instructions I just read. Again, those are the instructions you are to follow.  And any exhibits that were admitted into evidence in this case will also be placed in the jury room for your review.

When you go to the jury room, you should first select a foreperson who will help guide your deliberations and speak for you here in the courtroom.

The second thing you should do is review the

instructions.  Not only will your deliberations be more productive if you understand the legal principles upon which your verdict must be based, but for your verdict to be valid, you must follow the instructions throughout your deliberations.

Remember, you are the judges of the facts, but you are bound by your oath to follow the law stated in those instructions.

To reach a verdict, whether it is guilty or not guilty, all of you must agree.  Your verdict must be unanimous on each count of the superseding indictment.

Your deliberations will be secret.  You don't have to later explain your verdict to anyone.  You must consult with one another and deliberate in an effort to reach agreement, if you can do so.  Each of you must decide the case for yourself, but obviously after an impartial consideration of the evidence with your fellow jurors.

During your deliberations, do not hesitate to re-examine your own opinions and change your mind if convinced you are wrong.  But do not give up your honest belief solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

Remember, at all times, you were the judges of the facts.  You must decide whether the government has proved the defendant guilty beyond a reasonable doubt.

A form of verdict must be -- or excuse me.

The verdict form has been prepared for your convenience.  The foreperson will write the unanimous answer of the jury in the space provided for each count of the superseding indictment, either guilty or not guilty, and either yes or no for the interrogatory if you find the defendant guilty of Count 1, 2 and 7.  At the conclusion of your deliberations, the foreperson should date and sign the verdict.

If you need to communicate with me during your deliberations, the foreperson should write a message and give it to Ms. Myhaver.  I will either reply in writing or bring you back into the courtroom to respond to your message.  Under no circumstance should you reveal to me the numerical division of the jury.

Instruction Number 37, communication with the Court. If you want to communicate with me at any time during your deliberations, please write down your message or question and give it to the marshal or the bailiff.  In this case, it will be Ms. Myhaver.  She will bring it to my attention.  I will respond as quickly as I can either in writing or by having you return to the courtroom so I can address you orally.  I do caution you, however, that with any message or question you might send, you should not tell me any details of your deliberations or indicate how many of you are voting in any particular way on any particular issue.

Again, let me remind you that nothing I have said in

these instructions, nor anything I have said or done during the trial was meant to suggest to you what I think your decision should be.  That is your exclusive responsibility.

Now, you may recall all the way back to Monday that we discussed that we would be selecting 12 jurors to sit and one alternate.  So at this time, I will announce who the alternate is.  Unfortunately, the alternate juror cannot deliberate as part of the jury.  Therefore, I will need to release one of you, and I do apologize in advance for you being excused.  I told you before that I sat on a jury, I was the alternate, so I also didn't deliberate in that case, so I understand that filing.  But it is an important part of the process.

So in this matter, Juror No. 29, Mr. Seth Millington, you have been selected as the alternate juror.  I thank you very much for your service and your time here.

When I ask Ms. Myhaver to take the jurors back into the deliberation room, you should go become to the jury room, collect your belongings, turn in your badge to Ms. Myhaver and then you may leave and go home.  I do have a certificate for you to certify your service and some additional paperwork and Ms. Myhaver will coordinate that with you.

You should not talk about the case with the other jurors before you leave.  And even when you leave, you should not talk about the case with anyone else.  There are circumstances under which you, as the alternate juror, if

693

someone is unable to continue to serve as a juror, where you will be called and asked to come pack.  Ms. Myhaver will coordinate with you to let you know either way.  And ultimately, if the jury does conclude without you, she will let you know what the outcome is.

The rest of you will now be escorted to the jury deliberation room, and you will begin your deliberations.  So I will not tell you at this time that you may not confer with one another about the case.  You now may do that.  The only limitation there is that you may not discuss the case unless all of you are present and you may not discuss the case still with anyone other than your cojurors.

So if you wish, you may go beyond 3 o'clock today.  However, I will need to have you complete no later than 5:30 for today.

If you are not able to reach a verdict today, you will return tomorrow.  I will leave it up to the jurors to determine what time you want to return tomorrow.  You may come back in as early as 8 a.m.  But if you want to come back later, that will be up to you all to decide as a group.  I just ask that you have your jury foreperson communicate with Ms. Myhaver the times that you will deliberate tomorrow and each day as necessary to complete your deliberations.

So you will now be escorted to the jury deliberation room, and you will begin your deliberations.

Ms. Myhaver, will you please come forward to be sworn in.

(Bailiff sworn)

THE COURT:  Will you now please escort the jury to the jury room and provide the original jury instructions and verdict form to the jury and verify that all officers who may relieve you, if there is anyone that would relieve you, that they will take the same oath that you just completed.

THE DEPUTY CLERK:  Yes.

THE COURT:  Ladies and gentlemen, you may now be escorted to the jury deliberation room.

(The jury retired to deliberate at 1:51 p.m.)

(Continued on next page)

(In open court; jury not present)

THE COURT:  Counsel, if you will give the exhibit binders to Ms. Myhaver -- I assume that's already been done -- so we have the final version of the exhibits.

Please give Ms. Myhaver your phone number.  I ask that you be within a short distance of the courthouse so that if there's a question or we get a verdict that you can return promptly to the courthouse.

Do we have any other matters?

Mr. Gainor, I know you had an objection you wanted to reserve.

MR. GAINOR:  Yes, your Honor.

THE COURT:  Hold on just a moment.

Go ahead.

MR. GAINOR:  During the initial opening of the government through Mr. McIntyre, there was a statement made that Mr. Gainor won't address or won't comment something.  That motion that I reserved contemporaneous is my fifth motion for mistrial.  It's based on the government's comment, which directly affects the burden of proof.  It came out in front of the jury.

Again, I'm not going to be asking for a curative.  It is an argument of counsel.  But the comment directly emphasized a statement that had implications on a burden, when the burden is only on the government.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

So for that reason and without any further argument, I would make a motion for mistrial.

THE COURT:  Do you want to respond, Mr. McIntyre?

MR. MCINTYRE:  Sure.

We oppose that request.  I think the subsequent follow-up part of my argument did indeed cure any potential misunderstanding related to that comment.  I recognized the basis for Mr. Gainor's objection once he stood up, and out of an abundance of caution, I broke from my prepared remarks to make clear to the jury that he has no burden, the burden is a hundred percent on the government.  I think I said it twice, in fact.  I think I used the legal terms related to burden of proof.  I don't recall my exact comments, but whatever the comments were, I believe they were intended and sufficient to cure my understanding from my prior comment that Mr. Gainor has a burden.  And specifically, I told the jury that he did not and indicated my comment should not be so construed.

THE COURT:  The Court has received the defendant's objection and fifth request for a mistrial in this matter.  The Court will deny that motion.

As Mr. McIntyre points out, he promptly acknowledged the issue and advised the jury that, again, there is no burden on the defendant.

I understand the defense's argument to be that there was some shifting of the burden or at least argument that the

burden should be shifted.

Number one, this court has repeatedly advised the jury very clearly that the statements of the lawyers are not evidence and are not legal instructions.  The legal instructions come from this court and are contained in the instructions that they have just been provided in those instructions, as well as in the instructions that the Court gave at the beginning of this case.  The jury was advised that the burden is on the government and the government alone and that the defendant has no burden to present any evidence in this case.  The jury has been amply advised in the particular instructions that they have been sent back to the jury room as to what the burden of proof is and where they should look for their instruction, which is not to counsel's argument, but to the actual instructions.

MR. GAINOR:  Your Honor, may -- I'm sorry to interrupt.  I'll wait until the Court is done.

THE COURT:  I'm done.

MR. GAINOR:  Your Honor, I wanted to also add that the statements by Mr. McIntyre with regard to burden shift were also potentially amplified during my closing when I was accused of misstating the law.  And on two occasions, the Court had to tell the jury that it is argument of counsel.  So I think it's the combination of both statements and the general activity of the government that forms the basis for the fifth motion for

mistrial.

THE COURT:  The Court's ruling stands for the reasons as already set forth in the record.

MR. GAINOR:  Yes, your Honor.

THE COURT:  Anything else?

MR. GAINOR:  Other than, from both sides, thanks for being patient with us during this trial.

MR. MCINTYRE:  Yes, your Honor.

THE COURT:  Well, I do thank both sides for their work.  I know you worked hard on this case, the professionalism, and I would say that both sides have been very ably and completely represented by their counsel, who are very committed to each side's cause.  And so I acknowledge both of you and congratulate you on a well tried case.

And we will await the outcome of this case.  But it was a pleasure having all of you in court today.

And with that, I'm going to sign these certificates for our alternate.  And again, make sure you give your information to Ms. Myhaver and you remain close by so that we can reach you quickly.

Thank you.  And we're in recess.

(Recess pending verdict)

THE COURT:  I have been advised that we have a verdict.

Are we ready to bring in the jury?

MR. MCINTYRE:  Yes, your Honor.

MR. GAINOR:  Yes, your Honor.

THE COURT:  Let's bring in the jury.

(Continued on next page)

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

(In open court; jury present)

THE COURT:  Back on the record in 24-cr-00082, United States v. Meek.  The record will reflect that all members of the jury are present.

I have been informed by a note from the jury's foreperson that the jury has reached a verdict in this case.

Will the foreperson of the jury please stand and be identified.  That was Juror No. 12.

Has the jury in fact reached a unanimous verdict concerning all counts in this case?

THE FOREPERSON:  We have.

THE COURT:  And have you all signed the verdict form?

THE FOREPERSON:  We have.

THE COURT:  If you would please hand the verdict form to Ms. Myhaver, who will then hand it to me.

I will now read the verdict.

Count One:  We, the jury, upon our oaths, unanimously find the defendant, Nathan James Meek, guilty of the offense charged in Count One of the superseding indictment.

Special verdict as to Count One:  If you find the defendant not guilty of the offense charged in Count One, please do not answer the following questions.  If you find the defendant guilty of the offense in Count One, please answer the following:

We, the jury, have found the defendant guilty of the

offense charged in Count One of the superseding indictment and further unanimously find beyond a reasonable doubt that the offense in Count One involved 40 grams or more of a mixture or substance containing a detectable amount of fentanyl.

Count Two:  We, the jury, upon our oaths, unanimously find the defendant, Nathan James Meek, guilty of the offense charged on Count Two of the superseding indictment.

Having found a special verdict as to Count Two:  We the jury, having found the defendant guilty of the offense charged in Count Two of the indictment further unanimously find beyond a reasonable doubt that the offense in Count Two involved, A, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine; B, 50 grams or more of methamphetamine actual.

Count Three:  We, the jury, upon our oaths, unanimously find the defendant, Nathan James Meek, guilty of the offense charged in Count Three of the superseding indictment.

Count Four:  We, the jury, upon our oaths, unanimously find the defendant, Nathan James Meek, guilty of the offense charged in Count Four of the superseding indictment.

Count Five:  We, the jury, upon our oaths, unanimously find the defendant, Nathan James Meek, guilty of the offense charged in Count Five of the superseding indictment.

Count Six:  We, the jury, upon our oaths, unanimously

find the defendant, Nathan James Meek, guilty of the offense charged in Count Six of the superseding indictment.

Count Seven:  We, the jury, upon our oaths, unanimously find the defendant, Nathan James Meek, guilty of the offense charged in Count Seven of the superseding indictment.

Special verdict as to Count Seven:  We, the jury, having found the defendant guilty of the offense charged in Count Seven of the indictment further unanimously find beyond a reasonable doubt that the quantity of controlled substances involved in the conspiracy attributable to the defendant as a result of his own conduct and the conduct of other conspirators known or reasonably foreseeable to him was:

A, 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine;

B, 50 grams or more of methamphetamine actual; fentanyl, 40 grams or more of a mixture or substance containing a detectable amount of phenyl-N-4-piperidinyl propanamide fentanyl.

It is signed and dated the 17th day of July 2025 by the foreperson and each juror.

Do either party request the Court to poll the jurors?

MR. MCINTYRE:  Not the government, your Honor.

MR. GAINOR:  The defense does, your Honor.

THE COURT:  Ladies and gentlemen, defense has

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

703

requested that the Court verify individually to each juror and confirm that this is indeed their verdict.  So I will call you by juror number and ask you to stand, and the question will be: Is this in fact your verdict?

THE COURT:  Juror No. 1, is this in fact your verdict?

JUROR NO. 1:  It is.

THE COURT:  Juror No. 2, is this in fact your verdict?

JUROR NO. 2:  Yes.

THE COURT:  Juror No. 3, is this in fact your verdict?

JUROR NO. 3:  Yes.

THE COURT:  Juror No. 4, is this in fact your verdict?

JUROR NO. 4:  Yes.

THE COURT:  Juror No. 5, is this in fact your verdict?

JUROR NO. 5:  Yes.

THE COURT:  Juror No. 6, is this in fact your verdict?

JUROR NO. 6:  Yes.

THE COURT:  Juror No. 12, is this in fact your verdict?

JUROR NO. 12:  Yes.

THE COURT:  Juror No. 32, is this in fact your verdict?

JUROR NO. 32:  Yes.

THE COURT:  Juror No. 15, is this in fact your verdict?

JUROR NO. 15:  Yes, it is.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

THE COURT:  Juror No. 19, is this in fact your verdict?

JUROR NO. 19:  Yes.

THE COURT:  Juror No. 20, is this in fact your verdict?

JUROR NO. 20:  Yes.

THE COURT:  Juror No. 34, is this in fact your verdict?

JUROR NO. 34:  Yes.

THE COURT:  Thank you.

Ladies and gentlemen, you have now completed your duties as jurors in this case, and you are discharged with the thanks of the Court.

The question usually arises whether you may now discuss this case.  Whether you talk to anyone about this case is entirely up to you, with the exception of the lawyers in this case, who have been instructed not to contact you.  It is proper for others to discuss the case with you and you may talk with them as much or as little as you like about your deliberations or the facts that influenced your decision.

If any person persists in discussing the case over your objection or becomes critical of your service either before or after any discussion has begun, please report it immediately to Ms. Myhaver, and I will handle it from there.

I thank you very much for your service.  I generally

705

do like to talk to the jurors and thank each of you personally, I also have certificates of appreciation for your service that I can provide to you.  And if you want to wait a couple minutes, I will be in directly after I finish with a brief matter with the attorneys.

So again, we thank you.  At this time, if you will follow Ms. Myhaver back to the jury deliberation room, we will complete this portion of your service.

(Jury excused)

(Continued on next page)

(In open court)

THE COURT:  At this time, Mr. Meek, you are referred to the probation department for a presentence investigation report.  The probation department will conduct a presentence investigation and someone from that office will contact you.  You may have your attorney present with you during that interview, if you wish to do so.

THE DEFENDANT:  Yes, your Honor.  Thank you.

THE COURT:  A sentencing hearing is scheduled in this matter for October 2nd, 2025 at 11:00 a.m.

Does that work for all counsel?

MR. MCINTYRE:  Your Honor, I have a supervised release matter at 10 o'clock that day.

THE COURT:  Does that day work for you?

MR. GAINOR:  Your Honor, I neglected to have my calendar with me, but I'll make it work.

THE COURT:  Your supervised release hearing is at 10:00 a.m.?

MR. MCINTYRE:  I think it would be safe.  We can go ahead and set it for 11.  That's fine.

THE COURT:  Just let us know if you're going to be a little bit late.  I assume that's in this building.

MR. MCINTYRE:  It is, your Honor.

THE COURT:  If it is looking like your hearing is going long, just let us and counsel know.

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105

707

MR. MCINTYRE:  Will do.  Thank you.

THE COURT:  Mr. Meek, you are remanded to the custody of the US Marshal for the District of Colorado pending sentencing.

Counsel, you are ordered to file your sentencing positions and motions for departure or variant sentencing and any other motions, including motions to decrease offense levels or dismiss counts at least 14 days before the sentencing date. Any responses or objections to such filings must be filed no later than 7 days before the sentencing date.  Failure to make these timely filed pleadings as ordered may result in a continuance of the sentencing date.  Post trials are to be submitted in accordance with the Federal Rules of Criminal Procedure.

If there's nothing further, we will be in recess.

(Adjourned)

SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294  (303)335-2105

I hereby certify that the foregoing is a true and accurate

transcript, to the best of my skill and ability, from my

stenographic notes.


*Sadie L. Herbert*
Official Court Reporter
U.S. District Court


SADIE L. HERBERT, RPR, RCR
901 19th Street, Denver, CO 80294   (303)335-2105